# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JAMES R GREEN
    PETITIONER

RECEIVED
SCRANTON

SEP 1 1 2000

PER _____
    (DEPUTY CLERK

CASE NO. 95 CR 57 (BDP)

98 CIV. 0090(BDP)

APPEAL NO. 98-2710

V

JONATHON MINER
    WARDEM/RESPONDENT

# 1: CV 00-1631

FILED
SCRANTON

SEP 1 3 2000

PER _____
    DEPUTY CLERK

APPLICATION FOR WRIT OF HABEAS CORPUS
PURSUANT TO 28 U.S.C. § 2241(G)(3)

JAMES R GREEN
FPC ALLENWOOD
P.O. BOX 1000
MONTGOMERY PA 17752

FORM FOR USE IN APPLICATIONS

FOR HABEAS CORPUS UNDER 28 U.S.C. § 2241, et. seq.

me       JAMES R GREEN

     81791-054    AC

ison Number

    FPC ALLENWOOD, P.O. BOX 1000 MONTGOMERY PA 17752

ace of Confinement

ited States District Court   MIDDLE       District of   PENNSYLVANIA

se  o.    95 CR. 0057(BDP) , 98 CIV. 0090(BDP), APPEAL NO. 98-2710
o    supplied by Clerk of U.S. District Court)

    JAMES R GREEN                , PETITIONER

ull name)

v.

    JONATHAN MINER/ WARDEN RESPONDENT       , RESPONDENT

    (If petitioner has a sentence to be served in the _future_ under a federal
dgment which he wishes to attack, he should file a motion under 28 U.S.C.
255, in the federal court which entered the judgment.)

## PETITION

. Names and location of court which entered the judgment of conviction under
  attack UNITED STATES DISTRICT COURT OF SOUTHERN DISTRICT OF NY 300 QUARROPS ST. WHITE PLAINS
  NY. 10601

. Date of judgment of conviction MARCH 7, 1996

. Length of sentence _____ 72 MONTHS · Sentencing judge BARRINGTON PARKER JR.

. Nature of offense or offenses for which you were convicted:  (All counts)
  CONSPIRACY TO COMMIT WIRE FRAUD, INTERSTATE TRANSPORATION OF STOLEN PARTS,
  . WIRE FRAUD, CONSPIRACY TO COMMIT MONEY LAUNDERING , MONEY LAUNDERING, MAKING
     FALSE STATEMENTS.

. What was your plea?  (check one)
  (a)  Not guilty  (X)
  (b)  Guilty  ( )
  (c)  Nolo contendere  ( )
  If you entered a guilty plea to one count or indictment, and a not guilty ·
  plea to another count or indictment, give details: _____
  _____
  _____
  _____

. Kind of trial:  (check one)
  ) Jury  (X)
  b)  Judge only  ( )

. Did you testify at the trial? Yes  (X)   No  ( )

. Did you appeal from the judgment of conviction? Yes  (X)   No  ( )

. If you did appeal, answer the following:
  ) Name of court   UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT.
  b)  Result          DENIED
  (c)  Date of result NOVEMBER 14TH 1996

  Other than a direct appeal from the judgment of conviction and sentence, have
  you previously filed any petitions, applications, or motions with respect
  to this judgment in any court, state or federal? Yes  (X)   No  ( )

  If your answer to 10 was "yes," give the following information:
  (a)(1)     Name of court    DISTRICT FOR THE SOUTHERN DISTRICT OF NY. WHITE PLAINS NY
     (2)     Nature of proceeding    28 U.S.C. § 2255 COLLATERAL ATTACK

     (3)     Grounds raised     INEFFECTIVE ASSISTANCE OF COUNSEL AT ALL STAGES
             OF PROCEEDINGS. _____
             _____
             _____
             _____
             _____
             _____

3

(4) Did you receive an evidentiary hearing on your petition, application or motion? Yes ( )   No (X)

(5) Result _____

(6) Date of result _____

(b) As to any second petition, application or motion give the same information:

(1) Name of court _____

(2) Nature of proceeding _____

(3) Grounds raised _____

_____

_____

_____

_____

_____

(4) Did you receive an evidentiary hearing on your petition, application or motion? Yes ( )   No ( )

(5) Result _____

(6) Date of result _____

(c) As to any third petition, application or motion, give the same information:

(1) Name of court _____

(2) Nature of proceeding _____

(3) Grounds raised _____

_____

_____

_____

_____

(4) Did you receive an evidentiary hearing on your petition, application or motion? Yes ( )   No ( )

(5) Result _____

(6) Date of result _____

(d) Did you appeal to the highest court having jurisdiction the result of any action taken on any petition, application or motion:

(1) First petition, etc.        Yes ( )   No (X)

(2) Second petition, etc.    Yes ( )   No ( )

(3) Third petition, etc.      Yes ( )   No ( )

(e) If you did not appeal from the adverse action on any petition, application or motion, explain briefly why you did not: _____

_____

_____

_____

_____

_____

_____

_____

_____

State <u>concisely</u> every ground on which you claim that you are being held un-
lawfully.  Summarize <u>briefly</u> the <u>facts</u> supporting each ground.  If necessary,
you may attach pages stating additional grounds and <u>facts</u> supporting same.

A.    Ground one:    ~~INEFFECTIVE ASSISTANCE OF COUNSEL~~ , AT TRIAL STAGE
      _____

      Supporting FACTS (tell your story <u>briefly</u> without citing cases or
      law):    SEE ATTACHED FACTS .
      _____
      _____
      _____
      _____
      _____
      _____
      _____

B.    Ground two:    INEFFECTIVE ASSISTANCE OF COUNSEL, AT THE SENTENCE STAGE
      _____

      Supporting FACTS (tell your story <u>briefly</u> without citing cases or
      law):    SEE ATTACHED FACTS.
      _____
      _____
      _____
      _____
      _____
      _____

C.    Ground three:    INEFFECTIVE ASSISTANCE OF COUNSEL, AT THE APPEAL STAGE
      _____

      Supporting FACTS (tell your story <u>briefly</u> without citing cases or
      law):    SEE ATTACHED FACTS.
      _____
      _____
      _____
      _____
      _____
      _____

D.    Ground four:    _____

      Supporting FACTS (tell your story <u>briefly</u> without citing cases or
      law):    _____
      _____
      _____
      _____
      _____
      _____
      _____

If any of the grounds listed in 12A, B, C, and D were not previously presented in any other court, state or federal, state <u>briefly</u> what grounds were not so presented, and give your reasons for not presenting them: _____

_____
_____
_____
_____
_____
_____
_____

If you did not file a motion under section 2255 of Title 28, United States Code, or if you filed such a motion and it was denied, state why your remedy by way of such motion is inadequate or ineffective to test the legality of your detention;

(a)   **ISSUES WERE NOT AJUDICATED, JUST SUMMARILY DENIED WITHOUT A HEARING OR THE CHANCE TO APPEAL. ALSO ANSWER DOESN'T CONFORM TO THE LAWS OF THE UNITED STATES, AND CONSTITUTION.**

_____
_____
_____

(b)   **APPEALIBILITY SUMMARILY DENIED.**

_____
_____
_____

(c)   _____
_____
_____
_____
_____
_____

Do you have any petition or appeal now pending in any court, either state or federal, as to the judgment under attack? Yes ( )   No (**X**)

6

Give the name and address, if known, of each attorney who represented you in
the following stages of the judgment attacked herein:

(a)  At preliminary hearing _____

(b)  At arraignment and plea   MR. PERCY W. BRISCOE
     OLD POST RD. WAPPINGERS FALLS, N.Y. 12590

(c)  At trial   SAME AS ABOVE

(d)  At sentencing   MR. DOMENICK J. PORCO
     108 BROOK STREET SCARSDAL N.Y. 10583

(e)  On appeal      SAME AS ABOVE SENTENCING.

(f)  In any post-conviction proceeding _____

(g)  On appeal from any adverse ruling in a post-conviction proceeding: ____

_____

Were you sentenced on more than one count of an indictment, or on more than
one indictment, in the same court and at the same time? Yes (X) No ( ).

Do you have any future sentence to serve after you complete the sentence
imposed by the judgment under attack? Yes ( ) No (X)

(a)  If so, give name and location of court which imposed sentence to be
     served in the future: _____

(b)  And give date and length of sentence to be served in future: _____

(c)  Have you filed, or do you contemplate filing, any petition attacking
     the judgment which imposed the sentence to be served in the future?
     Yes ( ) No ( )

Therefore, petitioner prays that the court grant petitioner relief to which
may be entitled in this proceeding.

    I declare (or certify, verify, or state) under penalty of perjury that the
foregoing is true and correct.

Executed on ___SEPTEMBER 5, 2000___
                 (Date)


                              _____
                                        (Signature)


PRO,SE
    _____
    Signature of Attorney
         (if any)

7

# CONTENTS
# AUTHORITIES

# TABLE OF CONTENTS

page

PETITION FOR HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2241(A)(3)

*

TABLE OF AUTHORITIES /AND RULES

ISSUES PRESENTED

ISSUE 1 ............................................................ **
Petitioner received ineffective assisance of counsel at trial stage.

ISSUES 2 ............................................................ **
Petitioner received ineffective assisance of counsel at the sentencing stage.

ISSUE 3 ............................................................ ***
Petitioner received ineffective assistance of counsel at the appeal stage.

ARGUMENT ........................................................... 1–20

APPENDICES

Appendice  A  Exhibits

Appendice  B  judgment and commitment

### TABLE OF AUTHORITIES

Apprendi v New Jersey No. 99-478 decided June 26,2000

Jones v United States 526 U.S. 143·LED 2d 311,1195 S.CT 1215(March 24, 1999)

Carder v United States 120 S.CT 2159(2000)

Strictland v United States, 466 U.S. 668,687(1984)

United States v Cronic, 466 U.S. 648 658(1984)

House v Balkcom, 725 f2d 608(1984)

United States v Varella, 692 f2d 1352(11th cir. 1982)

United States v Knuckles, 581 f2d 305,313(2nd cir. 1978)

United States v Charlarca, 95 f3d 239(2nd cir. 1996)

United States v Wong, 40 f3d 1347,1366(2nd cir. 1994)

United States v Lovell, 16 f3d 494,497(2nd cir. 1994)

U.S. v Wood 6 f3d 692(10th cir. 1993)

Grunewald v United States, 353 U.S. 405

Deffenbaugh 957 f2d at 252

United States v Masterpool, 940 f2d 266(2nd cir. 1991)

U.S. v Gray, 878 f2d 702(3rd cir. 1989)

Jones v Wood 114 f3d 1002(9th cir. 1997)

United States v Reed, 629 f2d 896, 904(2nd cir. 1991)

Ladner v United States, 758 U.S. 167(1958)

United States v Holmes, 44 f3d 1150(2nd cir. 1995)

U.S. v Zvi 168 f3d 491(2nd cir. 1999)

Fishwick v United States, 329 U.S. 221,246,67 S.CT. 224, 91 LED 196(1946)

Krulewich v United States, 336 U.S. 440(1949)

U.S. v Tombrello, 666 f2d 485

U.S. v Santiago, 582 f2d 1128(7th cir. 1978)

Pointer v Texas, 820 U.S. 400,485 855 S.CT 1065 1068,13 LED 2d 923(1965)

Fernandez v Leonard, 242 f.supp 55(EDNY 1996)

cont........

Samuels v Mann, 13 f3d 522(2nd cir. 1993)

Bruton v United States 391 U.S. 12

United States v Ubakanma, 215 f3d 421(9th cir. 2000)

Richardson v United States 526 U.S. 813,119 S.CT 1701, 143 LED 985(1995)

United States v Atkinson, 788 f2d 900 (2nd cir. 1986)

U.S. v Tortara 994 f2d 79(2nd cir. 1995)

U.S. v Brumley, 59 f3d 517(5th cir. 1995)

Mason v Hanks, 97 f3d 887, 894(7th cir. 1996)

U.S. v Brechenridge, 93 f3d 132, 134(4th cir. 1996)

## STATUES

28 U.S.C. § 2255
18 U.S.C. § 1001
18 U.S.C. § 1956 & 1957
18 U.S.C. § 3579(e)(1)
18 U.S.C. § 371
18 U.S.C. § 2314
18 U.S.C. § 1343

## RULES

801 (d)(2)(e)
32(c)

## CONST. PROVISIONS

U.S.C.A. const. amend. 6
U.S.C.A. const. amend. 5

# STATEMENT OF ISSUES

## STATEMENT OF QUESTIONS PRESENTED

### ISSUE 1

Whether trial counsel's complete lack of knowledge of federal law, federal sentencing guidelines, trial procedures, court rules, interview techniques, cross examination techniques, and total lack of trial experience, amount to a total denial of the petitioners Sixth Amendment right to counsel, and makes the adversarial process itself presumptively unreliable, and the trial a Miscarrage Of Justice. Thus requiring a new trial.

### ISSUE 2

1. Whether sentencing attorney's failure to file a motion to dismiss counts 1 & 2 for failure of the government to prove (20 million dollars property value, stated in indictment, requires reversal.

2. Whether sentencing attorney's failure to file a motion, objecting to ,
   A. Property value of 8.2 million dollars arbitarily derived at by the court.
   B. Sentencing enhancement of more than minium planning and obstruction of Justice.
   C. $ 450,000 resitution which had no factual basis, arbitarily arrived at by court, should cause reversal of sentence.

3. Pursuant to the recent holdings in Apprendi v New Jersey no. 99-478 decided June 26,2000 , Jones v United States 526 U.S. 143 LED 2d 311,1195 S.CT 1215 (March 24,1999) and Carder v United States 120 S.CT 2159(2000), A. Whether value of the alleged property loss should be found beyond a reasonable doubt, rather then a proponderence of the evidence, since the value of the property was a large part of the indictment, B. Whether Obstruction of Justice enhancement and more than Minium Planning violated the petitioner's 5th amendment right to due process and should have been decided by the jury and whether the enhancement of $450,000 restitution violated the petitioner's right to due process , should   require reversal.

Issue's cont........

## ISSUE  3

Whether appeal counsel's failure to encompass all of the forementioned argument into the petitioner's direct appeal requires reversal.

***

# ARGUMENT

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JAMES R GREEN | ( | |
| PETITIONER | ( | Case No. 95 cr. 57(BDP) |
| | ( | 98 civ. 0090(BDP) |
| | ( | Appeal No. 98-2710 |
| | ( | |
| V | ( | |
| | ( | |
| | ( | |
| JONATHAN MINER | ( | |
| WARDEN/RESPONDENT | ( | |
| | ( | |

MEMORANDUM IN SUPPORT OF APPLICATION FOR WRIT OF
HABEAS CORPUS PURSUANT TO 28 U.S.C. SECTION 2241 (C)(3)

Comes now the petitioner James R Green pro,se in the above style, hereby chall-
enging his conviction and sentence. The petitioner states that he received ineff-
ective assistance of counsel at all stages of the proceeding, pre-trial, sentencing
and appeal stages. The petitioner has exhausted all remedies under 28 U.S,C. § 2255,
See exhibit (1). The petitioner states that his issues have not been ajudicated,
just summarily denied, and submits that he is innocent of the charges inwhich he
has been convicted and sentenced.

### PROCEDURAL HISTORY

The petitioner was convicted after a jury trial and sentenced on March 7, 1996 in
the United States District Court for the Southern District of New York, of Trans-
portation of stolen property in Interstate commerce(18U.S.C. § 2314 ), wire Fruad
(18 U.S.C. § 1343), conspiracy to committ same(U.S.G. § 371), Money Laundering and
Conspiracy to committ same(18 U.S.C. § 1956 & 1957) and making False Statements
(18 U.S.C. § 1001). The petitioner was sentenced to a term of (72) months imprison-
ment, three years supervised release and $450,000 in restitution.

## ARUGUMENT

## ISSUE 1

WHETHER TRIAL COUNSEL'S COMPLETE LACK OF KNOWLEDGE OF FEDERAL LAW, FEDERAL SENT-
ENCING GUIDELINES, TRIAL PROCEDURES, COURT RULES, INTERVIEW TECHNIQUES, CROSS
EXAMINATION TECHNIQUES, AND TOTAL LACK OF TRIAL EXPERIENCE, AMOUNT TO A TOTAL
DENIAL OF THE PETITIONER'S SIXTH AMENDMENT RIGHT TO COUNSEL, AND MAKES THE
ADVERSARIAL PROCESS ITSELF PRESUMPTIVELY UNRELIABLE, AND THE TRIAL A MISCARRAGE
OF JUSTICE, THUS REQUIRING A NEW TRIAL.

Generally in order to sustanin a claim of ineffective assistance of counsel, the

defendant must show that the counsel's performance was deficient and that the

deficient performance prejudiced the defense. Strickland v Washington, 466 U.S.

668,687(1984), United States v Cronic, 466 U.S. 648,658(1984) But as the supreme

court has stated there are exceptions to the general rule.

> There are however, circumstances that are likely to prejudice
> the accused that the cost of litigating their effect in a
> case is unjustified. Cronic, 466 U.S. at 658.

The petitioner highlights House v Balkcom, 725 f2d 608(1984)as a case on all fours

with h is case, and by comparison exposes the total failure of petitioner's counsel

to provide any kind of reasonable support. The petitioner's trial counsel being

totally incompetent caused many prejudicial errors (which will be summarized herein),

at pre-trial and at trial. The petitioner consistentl y complained about the assist-

ance he received from his trial counsel. He first exposes this by filing motion

after motion after trial to set aside the verdict based on counsel's total inabil-

ity to conduct a trial. The petitioner first motion under 18 U.S.C. 9b, and petit-

ioner's direct appeal. All occasions the petitioner complained about not receiving

effective assistance of counsel, and the lack of a fair trial. In petitioner's 28

U.S.C. § 2255 (herein after referred to as OB), the petitioner filed ineffective

assistance of counsel and exposes for the first time the prejudicial errors caused

by counsel. The petitioner's issues were not ajudicated. The petitioner was denied

cont...

without a hearing. In considering the totality of circumstances, to determine wheth-
er effective assistance of counsel has been rendered, a court looks to the quality
of counsel's assistance from the time of initial retention to the time of appeal
U.S.C.A. 6,14. Failure to investigate the facts is unconscionable,and falls below
the level of performance by counsel required by the sixth amendment. Pre-Trial
investigation principle because it provides a basis on which most of the defense's
case must rest , is perhaps the most critical stage of a lawyer's preparation.
U.S.C.A. Amend6. In House v Balkcom, a Georgia prisoner, sentenced to death, was
denied effective assistance of counsel, where counsel failed to develope a strategy
of any consequence, absented themselves at crucial portions of the trial, sought no
defense witnesses, failed to interview state's witnessess, didn't visit the crime
scene, failed to take advantage of significant and possible exculpatory evidence
available from the state'sown scientific tests, were unfamiliar with Capital senten-
cing statues and failed to move for a new trial based on evidence the victims were
alive after they were seen in the vicinity of the defendant. As in House v Balkcom
the petitioner's counsel didn't provide any effective help to the petitioner from
the initial stages through the trial. The petitioner's counsel failed to conduct
any pre-trial investigations what-so-ever. He failed to understand the magnitude
of the charges against the petitioner. He failed to understand the petitioner's
business and relationship to the government witnesses. He failed to interview gover-
nment witnesses. Petitioner's counsel failed to put forth any viable or legal strat-
egy, see counsel's affirmation starting on page 3 of exhibit (1a), which clearly
explains the petitioner's trial counsel's theory that the government witnesses having
to be corroborated. this theory convinced the petitioner that he could not be convict-
ed, caused petitioner's counsel not to do any investigation of the case, caused his
failure to interview any defense witnesses given him by the petitioner, cause his lack
of study and understanding of the Federal Rules of Evidence or understanding of
Federal Trial Procedures, and the Federal Sentencing Guidelines. When the court
dismissed the petitioner's counsel's theory, see page 5 of attorney's affirmation

cont.....

Exhibit (1a),petitioner's attorney, Mr. Briscoe, states "Your honor, I feel that co-conspirators testimony must be corroborated by some credible evidence, I don't think you can..." to which the court responded "that's a state law rule. I don't believe that applies in this court Mr. Briscoe". The petitioner was left without any defense. the petitioner's counsel's lack of knowledge of federal rules governing co-conspirators statements and corroboration caused a complete Miscarriage Of Justice, and constructively amounted to the petitoner having no counsel at all. In certain sixth amendment context, prejudice is presumed,actual or constructive denial of counsel altogether is legally presumed to result in prejudice. Strickland, 466 U.S. at 692(emphasis added ). This theory also resulted in the petitioner's counsel not submitting any jury instructions after a month long trial. As in House v Balkcom, where the magistrate heard the evidence relating to the effective assistance claim including the testimony of the criminal defense attorney's who testified that in their opinion House didn't receive effective assistance of counsel during, before or after trial as judged by the minimum standards of the community, Id at 615. Exhibits (1a) and (2) are affirmations if two criminal defense attorney's who under penalty of perjury, sate that in their opinion the petitioner's counsel was woefully ineffective. These attorney's affirmations by Dominick J. Porco and Richard Hendrex represent first hand knowledge of petitioner's counsel's performance, because they were defending other defendants in the same trial, whom were aquitted. Prior to his trial House , contends that his attorneys did nothing more than meet him and speak to some of his family members by telephone. House, asserts there was no discovery, no visiting of crime scene, and no trial preparation. Additionally House, asserts that the attorneys made little use, if any, of evidence garnered from the state's laboratory reports which tended to substantiate his innonence. See petitioner's exhibit (3). The affidavit clearly exposes as in House, the woeful lack of attention paid to petitioner's case by his counsel. As in House, the district court, although recognizing deficiencies, found no prejudice to petitioner. Prejudice is not required where the ineffectiveness of counsel is " so

cont.....

pervasive that a particularized inquiry into prejudice would be unguided specul-
ation". <u>Strickland v Washington, 693,f2d at 1259 n.26</u> . In <u>House v Balkcom</u>,the
stated "because we find that <u>House's</u> lawyers were so woefully inaduqate in the
collection, preservation, and presentation of evidence,that a new trial is required".
The petitioner's case is a mirror image of <u>House v Balkcom</u>, not on the particuliar
issues itself but on the ineffective assistance of counsel. The petitioner's
counsel woefully failed in all areas of his representation from collection, preser-
vation, presentation of evidence, and the overall basic knowledge required to con-
duct a federal trial of the magnitude of petitioner's case. This case represents
a **COMPLETE MISCARRIAGE OF JUSTICE.** The petitioner faced a skillful  prosecutor
in a major case without an effective attorney. It would be impossible under circum-
stances to receive a <u>fair trial</u>. The petitioner maintains that he is innocent. On
November 12,1998, Ken Starr testified at the House Judicial Committee hearing on
the impeachment of president Clinton. He stated that "the supreme court of the
United States stated that <u>All</u>  individuals have the right to the lawful disposition
of their case". The petitioner was not given that right. The petitioner has been
denied the right of a <u>FAIR TRIAL</u> and the right to appeal. The following is just a
summary of the multitude of errors made by  the petitioner's counsel, detail is
available from OB and amemdment.


### PRE-TRIAL


1(a) Counsel failed to investigate the case, to find out what the real case was all
about. Carl McDonald(the alleged co-conspirator who gave rise to the alleged cons-
piracy), accuse the petitioner of setting up the scheme to steal computer parts
from IBM, and that the petitioner told him the value of the parts. If the petition-
er's counsel had done any investigation he would have found that IBM and the U.S.
government were conducting stings since 1991 and couldn't convict or even indict
anyone. Also the petitioner's counsel would have found out that the whole depart-

cont.....

on the theft. See exhibit (4) where in 1999 the manager of the <u>Reutilization</u>
<u>Department,</u> (the same department where McDonald worked), was indicted for alleg-
edly stealing computer parts from1990 to July 1993. The charge was interstate
transportation of more than 20 million dollars worth of computer parts. To get
that figure the parts had to be the same type parts the petitioner was accused of.
The alleged conspiracy that involved the petitioner was alleged to have happened
in 1992. It is obvious where McDonald received his information from. With proper
investigation these facts would have been broughtout. (b). Also with further invest-
igation the peritioner's counsel would have found that there is no evidence of a
continuing plan or conspiracy beyond January 8, 1993. The duration and termination
is determined by particular facts of each case. See <u>United States v Varella, 692</u>
<u>f2d 1352(11th cir. 1982), United States v knuckles, 581 f2d 305,313(2nd cir. 1978).</u>
A conspiracy is generally deemed terminated with the last overt act. The last overt
act alleged by the government was January 8, 1993, however the alleged co-conspira-
tor was found not guilty of all charges, so the last overt act was November 1992.
See <u>United States v Charlarca, 93 f3d 239(2nd cir. 1996),</u> <u>United States v Wong,</u>
<u>40 f3d 1347, 1366(2nd cir. 1994),</u> and <u>United States v Lovell, 16 f3d 494, 497(2nd</u>
<u>cir. 1994</u>). The supreme court has unamiguously held that an act of concealment is
not part of an original conspiracy. <u>Grunewald v United States, 353 U.S. 405.</u> The
testimony of government witnesses Robert Gaines, Carl McDonald, statements allegedly
by Harold Jackman and exhibitswere all admitted testimonies about acts that happened
after the conspiracy had ended. The testimony and exhibits were all available at
Pre-trial.

2. Petitioner's counsel failed to request a dismissal of count (24), for failure
of the government to state a punishable offense. The petitioner was convicted of
18 U.S.C. § 1001, which provides that whoever in any jurisdiction of any department
or agency of the United States knowingly and willignly falsifies, conceals or covers
up by trick, or cover up a material fact or makes a false statement can be fined
and/or imprisoned. Most circuits recognize a judicial function exception to the

cont.....

operation of § 1001 based on a finding that a court is not a department or agency.
Deffenbaugh 957 f2d at 752. Under this exception, false statements made to a court
in a judicial proceeding are not covered by § 1001. In U.S. Wood 6 f3d 692(10th cir.
1993). The district court ruled that the FBI agents who interviewed defendant were
acting under authority of the Phoenix grand jury. The indictment specifically states
that the FBI interviewed defendant in furtherance of an investigation by the United
States grand jury in Phoenix. Also undisputed that at the end of the interview the
agents served a subpoena duces tecum on the defendant seeking records for the grand
jury. "Grand Jury investigations are criminal procedings that are a part of the
jusicial process". Deffenbaugh, 957 f2d at 752-753. These are exempt from prosecution
as for the Judicial Function Exception. See United States v Masterpool, 940 f2d 760,
766(2nd cir. 1991). As in the Woods case, the petitioner was interviewed by an IRS
agent in connection with a grand jury investigation. See Indictment 95-CR-57(BDP)
page 20 where grand jury charges false statements under § 1001 made August 12,1993
and page 21 where grand jury was empanald from March 1993 until date of indictment
in 1995. IRS agent upon completion of interview served a subpoena duces tecum on the
petitioner's business records. Clearly the agent was working for the grand jury as
described in Woods .

3. Counsel failed to investigate, interview and subpoena or call witnesses given to him
adwance by petitioner. "Defense counsel's failure to go to the scene of defendant's
arrest to locate potential witnesses, interview witnesses whose names had been given
to him by defendant or hire an investigator to track down potential witnesses was
ineffective assistance of counsel". U.S. v Gray 878 f2d 702 (3rd cir. 1989), Jones
v wood 114 f3d 1002(9th cir. 1997). Petitioner's counsel failed to investigate, sub-
poena, call, or interview at least (7) witnesses given him by the petitioner nine(9)
months before trial. See exhibit (5) pages 26-29 of petitioner's § 2255 brief, which
explains what each witness would have testified to, and how it would have been material
and how it would have affected the government witnesses testimony.

cont.....

4. Counsel failed to request dismissal of money launderin counts for being
Multiplicitous and never proven at trial. The indictment alleged each electronic fund
transfer charged in the money laundering counts twice. Once as a violation of § 1956
(A)(1)(B)(1) and again as § 1957 violations. therefore if the government got a convict-
ion on one count, then they would gain a conviction on the second count as well with-
out presenting any evidence. The doctrine of multiplicity prevents a prosecutor from
using several counts to charge a single crime. United States v Reed, 629 f2d 896,904
(2nd cir. 1991). Congress has repeatedly held that it does not authorize multiple
punishments for a single statue. See Ladner v United States, 758 U.S. 167(1958),
United States v Holmes, 44 f3d 1150(2nd cir. 1995). In Holmes, defendant was convicted
of two counts of money laundering under 18 U.S.C. § 1956 (A)(1)( B)(1) and (2) based
on a single transaction. The first provision prohibits money laundering designed to
conceal the proceeds of specific unlawful activity, and the second prohibits a report-
ing requirement. The second circuit considered the counts multiplicitous, even though
the two provisions address different evils, because knowledge of two improper purposes
rather than one does not multiply the offense of a single financial transaction into
two offenses, Id at 1155. An indictment is multiplicitous if it "charges a single
offense in more than one count", United States v Maldonaldo-Rivera, 922 f2d 934, 969
(2nd cir. 1990).Charging defendants with both domestic and international money laund-
ering based on the same funds transfers was multiplicitous, U.S. v Zvi, 168 f3d 49
(2nd cir. 1999). Petitioner's counsel failed to file a motion to dismiss the money
laundering counts for being multiplicitous, and money laundering not proven, see
exhibit (9) petitioner's § 2255 brief. For the above reasons, the petitioner requests
that those counts be dismissed.

## TRIAL

1. Trial counsel failed to object to and ask for limited instructions to statements of
government witness after conspiracy had ended. Carl McDonald who gave rise to the
alleged conspiracy, statements at trial are inadmissable against the petitioner. The

cont....

post arrest declarations and acts of Carl McDonald uttered and performed in the course

of his cooperation with the gonernment are not admissable as substantive evidence.

As pointed out in Fishwick v United States, 329 U.S. 221, 246 67 S.CT 224 91 LED

196(1946), confessions or admissions by one co-conspirator after he has been appreh-

ended is not in any sense furtherance of the criminal enterprise. His admissions[are]

therefore not admissable against his erstwhile fellow co-conspirators. Carl McDonald

was arrested by the New York state police January 14, 1993 on a charge of Larceny.

He was arrested again on August 6, 1993 at which time he entered into an agreement with

the government.(tr 285, 286, and 287). McDonald's post conspiracy declaration uttered

not only after he had been apprehended, but after he agreed to assist the government

lie well beyond the outer limits of an ongoing conspiracy exception to the hearsay

rule now embodied in rule 801 (d)(2)(e) of the federal rules of evidence and should

be excluded from the jury's consideration as substantive evidence. The Fishwick case,

has been reinforced by Krulewich v United States, 336 U.S. 440(1949), and is still

recognized as good law. If such evidence is   introduced it must be for a more limit

purpose and its introduction must be accompanied by an appropriate limiting instruction

to the jury.

2. Counselfailed to object and ask for limited instructions to statements made by

Robert Gaines taken for the truth as a co-conspirator in the alleged original conspir-

acy and prior to the conspiracy beginning and after the  alleged conspiracy ending.

A. Robert Gaines was not a conspirator as described in indictment . Robert Gaines,

according to his own testimony (tr 766) states that he was not part of the alleged

conspiracy. He said that he had no knowledge of any conspiracy. He testified that he

had not plead guilty to anything except money laundering. Statements made by Gaines

prior to conspiracy of concealment began are inadmissable for the truth. Alleged

co-conspirators hearsay statements after termination of conspiracy do not fall within

exception to hearsay rule and are thus inadmissable. U.S. Tombrello, 666 f2d 485. An

agreement to conceal a completed crime does not extend the life of the crime. Grunewald

cont.....

v United States, 353 U.S. at 405, Kruelwich v United States 336 U.S. 440, 698 S.CT 716, 92 LED 790 (1949). In petitioner's case the alleged conspiracy had ended prior to Gaines entering into a plea agreement with the government in July 1994.

3. Trial counsel failed to object statements made by a non-co-conspirator, taken for the truth of the matter, and trial consel failed to object to statements brought in by an alleged co-conspirator who was unavailable for cross examination . A. Lark Suddith testified as a co-conspirator. His own testimony and the governments's theory is that he was named in the indictment as the co-conspirator who drove trucks for Harold Jackman. The witness can not become a co-conspirator because the government alleges or believes him to be. According to Lark Suddith's direct testimony, he was a perfectly legitimate guy who was asked by his friend to deliver legitmate parts. (tr 614,616,626,629,630,and 727). A statement is admissable under 801(d)(2)(e) only when the government established by evidence independant of the statement itself that (1) a conspiracy existed, (2) that the defendant and the declarent were members of the conspiracy, United States v Santiago, 582 f2d 1128 (7th cir. 1978), United States v Kendall, 655 f2d 126, 131(7th cir. 1981). In petitioner's case Lark Suddith clearly was not a member of the conspiracy and his statements can not be used for the truth of the matter. Objection was offered by co-counsel backed by petitioner's counsel, but no limiting instruction was asked for and none was given. The statements proceeded to get into the record. Trial counsel failed to  object to statements brought in from an unavailable alleged co-conspirator Harold Jackmen, who died before the trial. His statements were offered by Lark Suddith for the truth. The U.S. supreme court has stated "that there are few subjects, more unanimous than in their expression of belief that the right of confrontation and cross examination are essential and fundamental requirements or a fair trial". Pointer v Texas, 320 U.S. 400, 485, 85 S.CT. 1068, 13 LED 2d 923(1965). The introduction of a non-testifying co-defendant's statement against the petitioner rendered the petitioner's joint trial fundamentally unfair. Fernandez v Leonard, 242 f suop. 55(EDNY 1990). Lark Suddith a non-conspirator is allowed to bring in an Unavailable alleged conspirator's statements Clearly convicting the

cont........

petitioner. Lark Suddith goes as far as to say that he admitted, referring to Jackman, that THIS WHOLE THING WAS FOUL (tr 626). The alleged stated confession by Harold Jackman said to be told to suddith, convicts the petitioner. See OB page 38. Since the petitioner had no way of cross examining Jackman for the truth, his alleged statements went to the jury and the record unchallenged. the confrontation clause bars admission of non-testifying co-defendants confessions incriminating a defendant. Samuels v Mann, 13 f3d 522(2nd cir. 1993), Bruton v United States 391 U.S. 12. The admission of the unavailable witness's statements rendered the petitioner helpless to defend himself.

4. The petitioner's counsel had no help in his office, so after the days events of trial, the petitioner's counsel had to drive (50) miles home to fishkill, NY, and resume work until late in the evening, along with the petitioner. As a result he often fell a SLEEP during much of the testimony against the petitioner.

5. Petitioner's counsel failed to object to the prosecutor when cross examining the petitioner. The prosecutor elicited from the petitioner the fact that he turned over the business records of his company in response to a grand jury subpoena. This was a clear violation of the petitioner's fifth amendment right against self-incrimination.

6a. Petitioner's counsel failed to request a charge to the jury to find on the value of the property allegedly lost by IBM. The indictment alleged that the property was worth $20 million dollars, but evidence at trial did not support this level of loss. b. The petitioner's counsel submitted only two jury instructions, both of which were thrown out as being based upon state law and not federal law. This left the petitioner to face the jury without proper instructions after a month long trial, and left the value of the property off the charge to the jury, which was a major part of the indictment.

cont.....

## SENTENCING

The petitioner's sentencing attorney failed to file a motion under Rule 29(b) to
dismiss counts (1) & (2) of the indictment for failure of the government to prove
the value of the property allegedly transported in interstate commerce. Count 1
on pages 3, 4, and 5 of the indictment (see exhibit 7) and count 2 on page 10
of the indictment, specifically state that the value of the property transported
in interstate commerce was more than $20 million dollars. 18 U.S.C. 2314 states
that whoever transports, transmits, and transfers in interstate commerce goods,
wares, and merchandise of the value of $5,000 and more knowing the same to have
been stolen, converted and taken by fraud, is in violation of title 18 U.S.C. 2314.
The indictment states "to wit more than $20 million dollars worth of IBM model 3090
memory cards".  b). The government put witnesses on the stand trying to prove its
case, but failed to do so. The petitioner's counsel failed tofile a motion of
acquittal on counts 1 & 2 and also failed to request the court to charge the jury
on the value of the property transported. The court further supports the govern-
ments failure to prove its case when the court states at sentencing "I believe
that, based on the testimony that I heard at trial that that figure of more than
$20 million and less than $ 40 million was somewhat high. In essence, reflected
the amount of money IBM could sell these products as new in an unselling market.
The testimony made it clear that these products were deposited in an inventory
that IBM called its end-of-life inventory". (see page 8 exhibit 6). The testimony
was given to the jury but the jury was not allowed to determine the facts and give
a verdict. The jury just gave a flat verdict of guilty on 18 U.S.C. 2314 without
making a determination beyond a reasonable doubt as to the value of the property.
Thus limiting the punishment to the lowest possible statutory range provided by
statue. See. United States v Unakanma 215 f3d 421(4th cir. 2000).

2. The petitioner's sentencing counsel failed to file a motion for an evidentiary

cont...

hearing to establish the value of the allegedly lost property, since it wasn't proven at trial.

3. The United States Supreme Court in <u>Carder v United States</u> 120 S.CT. 2159(2000) states that an indictment must state and the prosecution **PROVE AT TRIAL** value of property alleged to be stolen. In petitioner's case the value of the property was a major part of the indictment. However, the government failed to prove the level of loss at trial as aforementioned in issue 2. The court merely did not charge the jury nor was any verdict handed down on the value. The court at sentencing merely set the value at $8,270,000.00 . This was done without any hearing or any chance to defend against this value. The $8.27 million dollars value increased the petitioner's offense level form a level 6, the lowest statutory range, to a level 20 adding **FOURTEEN LEVELS**. All done at a preponderance level, without reviewing the evidence elicited at trial. This violated the petitioner's <u>fifth amendment</u> right to due process and his <u>sixth amendment</u> right that a trial guarantees. The Supreme Court, Stevens, J. concurring, In <u>Nathaniel Jones v United States, 526 U.S. LED 2d 311, 119 S.CT. 1215(1999)</u>, expressed the view that (1) it is unconstitutional for a legislature to remove from the jury the assessment of <u>FACTS</u> that increase the prescribed ranges of penalties to which a criminal defendant is exposed (2) such facts must be established by proof beyond a <u>REASONABLE DOUBT</u> and (3) a proper understanding of this principle would encompass facts that <u>INCREASE</u> the minium as well as the maximum permissible sentence. As part of the case Justice Scalia expressed the view that it was necessay to resolve all ambiguities in federal criminal statutes in such a fashion as to avoid violation of the principle that it is unconstitutional to remove from the <u>jury</u> the <u>assessment of facts</u> which a defendant is exposed. In <u>Apprendi v New Jersey, docket no. 99-478, decided June 26,2000</u>, the Supreme Court's judicial interpretation is that a defendant is entitled to have a jury decide, by proof beyond a <u>REASONABLE DOUBT</u>, every fact relevant to decide the determination of a sentence under a determinate sentencing scheme.

cont.....

7. The petitioner contends that he is innocent and begs for a new trial where both sides are deemed equals as guaranteed by the United States Constitution. Because of the ineptness, incompetence, and ineffectiveness of petitioner's counsel, the petitioner was found guilty.

## ISSUE 2

1.
WHETHER SENTENCING ATTORNEY'S FAILURE TO FILE A MOTION TO DISMISS COUNTS(1) & (2) FOR FAILURE OF THE GOVERNMENT TO PROVE (20 MILLION DOLLARS PROPERTY VALUE, STATED IN THE INDICTMENT, REQUIRES REVERSAL.

2. WHETHER SENTENCING ATTORNEY'S FAILURE TO FILE A MOTION, OBJECTING TO ,

   A. PROPERTY VALUE OF 8.2 MILLION DOLLARS ARBITARILY DERIVED AT BY THE COURT.
   B. SENTENCING ENHANCEMENT OF MORE THAN MINIUM PLANNING AND OBSTRUCTION OF JUSTICE.
   C. $ 450,000 RESTITUTION WHICH HAD NO FACTUAL BASIS, ARBITRARILY ARRIVED AT BY THE COURT, SHOULD CAUSE REVERSAL OF SENTENCE.

3. PURSUANT TO THE RECENT HOLDINGS IN APPRENDI V NEW JERSEY NO. 99-478 DECIDED JUNE 26,2000, JONES V UNITED STATES 526 U.S. 143 LED 2D 311, 1195 S.CT. 1215 (MARCH 24,1999 AND CARDER V UNITED STATES 120 S.CT. 2159 (2000),

   A. WHETHER VALUE OF THE ALLEGED PROPERTY LOSS SHOULD BE FOUND BEYOND A REASON-ABLE DOUBT, RATHER THEN A PREPONDERANCE OF THE EVIDENCE, SINCE THE VALUE OF PROPERTY WAS A LARGE PART OF THE INDICTMENT.

   B. WHETHER OBSTRUCTION OF JUSTICE ENHANCEMENT AND MORE THAN MINIUM PLANNING VIOLATED THE PETITIONER'S 5TH AMENDMENT RIGHT TO DUE PROCESS AND SHOULD HAVE BEEN DECIDED BY THE JURY AND WHETHER THE ENHANCEMENT OF $450,000 REST-ITUTION VIOLATED THE PETITIONER'S RIGHT TO DUE PROCESS, SHOULD REQUIRE REVERSAL.

cont.....

It is clear from the latest Supreme Court decisions that petitioner's 5th and 6th amendment constitutional rights were violated by the court removing from the jury the decision on the value of the property. This decision has to be reversed and the petitioner resentenced.

4. The enhancements for <u>Obstruction Of Justice</u> and <u>More Than Minimum Planning</u> share the same argument as aforementioned in Issue number 2 & 3. The court at sentencing mentioned several facts that the jury might have found to be material and false when the petitioner took the witness stand. The jury could have just as well found the same facts to be true. Because the court took the decision away from the jury and at a preponderance level found the petitioner guilty of more than minimum planning and perjury, thus increasing the petitioner's overall level by 4 points,we will neverknowwhat the jury would have done. The <u>JONES/APPRENDI</u> mandate requires that the increase in incarceration based upon an elemental relevant fact can only be determined constitutionally  by a jury beyond a reasonable doubt. The Supreme Court in <u>Richardson v United States, 526U.S. 813, 119 S.CT. 1701, 143 LED 2d 985 (1999),</u> made it clear that "The jury must agree unanimously" <u>id.at page 1710</u>. It is improper in sentencing for a judge to assume specific unanimity as to any such fact.

5. The enhancement to the petitioner's sentence by the court ordering $450,000.00 restitution violated the petitioner's due process rights under the fifth amendment. The statue <u>18 U.S.C. § 3663</u> requires federal courts to consider the following factors when deciding whether to order restitution and the nature and amount of restitution, if any;(1) The loss suffered by the victim as a result of the offense(s); (2) The financial resources of the defendant and defendant's dependants; and (4) such other factors as the court deems appropriate. The federal court must establish the amount of the <u>actual loss</u> suffered by the victim when it determines the amountof restitution the defendant will be required to pay. The burden of demonstrating the amount of the loss sustained  by the victim as result of the

cont...

offense shall be on the attorney for the government. In the petitioner's case
the government included as part of the indictment counts 1 & 2, the alleged value
of the property. As stated by the court, the value of $20 million to $ 40 million
was not proven. This value included surplus excess parts to be scrapped. Thus
the government never proved the loss. The court took the value requirement from
and the jury onto itself by setting a value of $8.27 million dollars. The court
in setting this value did not take into consideration (1) That testimony at trial
the government,s own witness stated that only 320 memory boards found could be
attributed to McDonald, worth less than $1 million dollars; That there were other
thefts involved that he failed to take into his conclusion (see exhibit 8). The
court did not negotiate down the $8.27 million dollars. The court merely picked a
number which hadno basis in the case;(3) The court overlooked its own words when
it stated that the memory boards were not new and considered scrap;(4) Also the
court did not consider THIRD PARTY PAYMENTS. Congress has mandated that restit-
ution not result in double recoveries by the crime victim 18 U.S.C. § 3579(e)(1).
The court under this statute, it is imperative that restitution not be imposed
without the court's considering third party payments. United States v Atkinson,
788 f2d 900(2nd cir. 1986). In the petitioner's case IBM had to be compensated for
all inventories, either by insurance or income tax deduction. All companies with
major inventories are protected from loss. Loss also means when inventory goes
from new to surplus excess, or other than new. Surplus excess after being claimed
is then either used as used parts or is crushed. IBM doesnot sell used parts In
esscence, the parts had no  value  for IBM. Also the value of the parts doesn't
mean revenue loss, in this case. IBM claimed lost of market share, not loss from
revenue loss. So the court's not considering third party payments is a major viol-
ation     to the petitioner. In U.S. v Tortara, 994 f2d 79 (2nd cir. 1993), the
case was remanded so the court could consider or indicate that it has considered
the factors set forth in 18 U.S.C. § 3664(a) governing restitution. In the petit-

cont.....

The PSI recommended no restitution after their investigation. The petitioner was not only indigent but unable to pay restitution even in the futhure because he was (50) years old at the time, will be (55) years old when released, retired, and his earning capacity very limited. The court ignored all the requirements to impose restitution. The restitution order not only caught the petitioner by surprise (because with no prior notice, pursuant to Rule 32 of the Federal Rules Of Criminal Procedure), but also     caught the government by surprise. Both parties were expecting no restitution, based on the aforementioned reasons. This sentence based on those reasons, must be reversed.


## ISSUE 3

WHETHER APPEAL COUNSEL'S FAILURE TO ENCOMPASS ALL OF TH E AFOREMENTIONED ARGUMENT INTO THE PETITIONER'S DIRECT APPEAL REQUIRES REVERSAL.

Petitioner received ineffective assistance at the appeal stages of proceedings. The six amendment entitles criminal defendants to effective assistance of counsel, not only at trial but during first appeal as in right of unrepresented appellant unable to protect vital liberty at stake. Appellant whose counsel is unable to provide effective respresentation is in no better position than one who has no counsel at all. Defendant whose lawyer does not provide him with effective assist- ance on direct appeal, U.S.C.A. Amend. 6. Petitioner's appeal counsel failed to raise;(1) Co-conspirator atatements allowed into evidence without objection and no limiting instruction given or asked for by petitioner's trial counsel. (2) Appeal counsel failed to argue on appeal statements that were allowed into evid- ence before conspiracy had ended and before conspiracy had begun in clear violation. (3)Counsel failed to argue on appeal statements allowed into the record for the truth, of non-co-conspirator and the statements by an alleged co-conspirator who was unavailable to be cross examined, violating the sixth amendment right to con-

cont....

issues of Obstruction of justice and that thesecharges should have been submitted
to the jury as aforementened. (b) The money laundering charges were multiplicitious
and  unproven and should been part of the petitioner's direct appeal. (c) The value
of the property should have been submitted to the jury, because it was a large
part of the petitioner's sentence, and should be    part of the petitioner's appeal.
(5) The petitioner was convicted under count (24) for false statements pursuant to
18 U.S.C. § 1001. The government failed to state a chargeable offense. This conv-
iction has to be reversed. Petitioner's appeal counsel failed to include it as
part of the direct appeal. (6) Petitioner's appeal counsel failed to argue lack
of evidence to sustanin petitioner's conviction for counts 3,4,and 5. There is
no independent evidence outside of Carl McDonald's statements that show any cons-
piracy to commit wire fraud as stated in counts 3,4 and 5. In order to prove that
defendant h as used or cau sed the use of interstate wire communications, for the
purpose of prosecution for wire fraud. The government must show that the defendant
knew or that it was forseeable to him that interstate wire communication fraud
would result, 18 U.S.C. § 1343. In order for a wire fraud conviction to stand, it
must be foreseeable to the defendant that his actions will result in interstate
wire fraud. Prosecution, where an individual does not personally communicate but
is alleged to cause another to communicate via interstate wires, as foreseeability
is not necessarily readily apparent, 18 U.S.C. § 1343. Essential elements of
conspiracy to interstate wire fraud are an agreement between two or more persons
to commit interstate wire fraud, an overt act by oneof the conspirators in furth-
ance of the conspiracy 18 U.S.C. § 371. The government has to prove beyond a
reasonable doubt that the defendant agreed to engage in a scheme to defraud in
which interstate wire fraud was .    . foreseeable. In the instance of this case,
there was no evidence at trial tc  prove that the petitioner could foresee that
McDonald was committing wire fraud in his communications with Harold Jackman.
Harold Jackman's testimony can not be heard and is unavailable. So, in abscence
of Carl McDonald,there is no evidence to sustain a conviction of the petitioner

cont....

of contact by the petitioner. (c) no proof of any fraud discussed over the telephones. (d) there is substantial legitimate contact between McDonald and Jackman. See U.S. v Brumley, 59 f3d 517(5th cir. 1995), where in order to determine whether Brumley or Cely cause an interstate wire communication, the issue is was it foreseeable to them that their actions would cause the Western Union agents to commit interstate wire communication. That case was reversed for lack of evidence . The petitioner case should have been argued on direct appeal by his counsel. The above six issues are major areas where the petitioner received ineffective assistance of counsel at trial and sentencing. These major areas should have been argued on appeal. The police officer's testimony that confidential informant had twice told officer that defendant was dealing heroin may have been inadmissable hearsay and was prejudicial to defense and thus test-imony caused ineffective of assistance of counsel, where jury was not given limit-ing instruction. Mason v Hanks, 97 f3d 887,894 (7th cir. 1996). Although defendants failure to raise claim asserted on motion to vacate or correct sentence at either sentencing hearing or direct appeal would ordinarily bar collateral attack review, defendant's claim alleged ineffective assistance of counsel which constituted cause for failure of previously raised issue. U.S. v Brechenridge, 93 f3d 132,134(4th cir. 1996) .


## CONCLUSION

In summary, the petitioner received ineffective assistance of counsel at trial. sentencing and appeal stages of proceeding. Trial counsel failed to understand the case in chief. He failed to understand this case was basically a case of theft of computer parts from IBM by Carl McDonald and the sale to brokers who sold the product. Also, he failed to understand that after arrest, McDonald was no longer an alleged co-conspirator, therefore, his statements and zeal to inculpate the e petitioner were inadmissable. Also he failed to understand that testimony by

cont.....

admissable and the alleged unavailable co-conspirator statements brought in in violation of the petitioner's sixth amendment right of confrontation. These issues, trial counsel failed to recognized because he failed to understand the basic rules of federal criminal procedure which federal trials follow. The sentencing counsel failed to object and offer memorandum to object to points added to petitioner's sentencing level for more than minimum planning, obstruction of justice and amount of money used to calculate the base offense and restitution. The appeal counselfailed to argue on appeal, sixth amendment violations, of confrontation, statements received in evidence without objection or instruction, petitioner's conviction for money laundering, two point enhancement for more than minimum planning, obstruction ofjustice and petitioner's convictions on counts 3,4 and 5, all never proven at trial and should be overturned for lack of evidence. Because the petitioner received ineffective assistance of counsel, and because facts that should have been given to the jury to find at a reasonable doubt level, were found by the court at a preponderance level, the judgement of conviction has to be reversed and remanded for a new trial.

RESPECTFULLY SUBMITTED

James R Green
81791-054 AC
FPC Allenwood
P.O. Box 1000
Montgomery PA 17752

## APPENDICES A

**EXHIBIT 1**
28 U.S.C. § 2255 results

**EXHIBIT 1A**

affirmation of attorney

**EXHIBIT 2**

AFFIRMATION OF ATTORNEY

**EXHIBIT 3**
AFFIDAVIT OF JAMES R GREEN

**EXHIBIT 4**

ARTICLE OF IBM THEFTS

**EXHIBIT 5**

WITNESSES FOR THE DEFENSE

**EXHIBIT 6**

SENTENCING MINUTES

**EXHIBIT 7**

INDICTMENT

**EXHIBIT 8**

MORE THEFTS THAN McDONALD

**EXHIBIT 9**

MONEY LAUNDERING

## APPENDICES B

JUDGEMENT & COMMITMENT

**EXHIBIT 1**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------x
JAMES R. GREEN,                    :
                                   :    98 Civ. 0090 (BDP)
        -against-                  :    [95 Cr. 0057 (BDP)]
                                   :
UNITED STATES OF AMERICA,          :    MEMORANDUM and ORDER
                                   :
        Respondent.                :
-------------------------------x
BARRINGTON D. PARKER, JR., U.S.D.J.


By Petition docketed November 14, 1997, James R. Green
seeks to vacate his conviction and sentence imposed November 3,
1995 under a multiple count indictment charging him, _inter alia_,
with conspiracy to commit wire fraud, interstate transportation
of stolen goods, mail fraud, and conducting financial
transactions to conceal the source of proceeds of illegal
activities.  See 28 U.S.C. § 2255.

On March 7, 1996, this Court sentenced Green to 72
months in prison followed by three years supervised release.
This Court also imposed restitution of $450,000 and a mandatory
special assessment of $850.  Green appealed his conviction and
sentence to the Court of Appeals which affirmed on November 14,
1996.

In this Petition, Green contends that he received
ineffective assistance of counsel at trial, at sentencing, as
well as on appeal.  However, he fails to meet the test
articulated in Strickland v. Washington, 466 U.S. 668 (1984) as

1

he has not shown that his counsel's performance "fell below an objective standard of reasonableness" or that there is a "reasonable probability" that, but for counsel's error, the outcome would have been different at any stage of the proceedings.  Id. at 684, 674.

This Petition is largely a rehash of the matters that Green raised on direct appeal and which were rejected. Specifically, the Court of Appeals addressed and rejected Green's claim of ineffective assistance of counsel at trial finding that "Green was convicted on the basis of extensive evidence, including not only testimony of multiple accomplices, but also corroborating testimony by third parties and documentary evidence. ( This evidence was compounded by Green's own testimony at trial, which the trial judge characterized as perjurious.)  In this context, any errors by Green's trial counsel were harmless." (Slip. Op. at 6)  It is well settled in this Circuit that a prisoner may not use a Section 2255 petition "to relitigate questions that were raised and considered on direct appeal," Riascos-Prodo v. United States, 66 F.3d 30, 33 (2d Cir. 1995); Cabrera v. United States, 972 F.2d 23, 25 (2d Cir. 1992).

With respect to ineffective assistance of counsel at sentencing, Green's primary contention is not that his sentence exceeded the applicable statutory maximum or was otherwise illegal, rather that the Court misapplied the sentencing

2

guidelines.  Green fails to demonstrate why this matter was not
raised on direct appeal.  In any event, it is well settled that a
collateral attack on a final judgment in a criminal case is
generally available under § 2255 only for a constitutional error,
a lack of jurisdiction, or an error of law or fact that
constitutes a fundamental defect which inherently results in a
complete miscarriage of justice.  <u>Femia v. United States</u>, 47 F.3d
519, 525 (2d Cir. 1995); <u>Lucas v. United States</u>, 963 F.2d 8 (2d
Cir. 1992).  None of the alleged errors in guideline computations
relied on by Green in support of his contention that his new
counsel was ineffective at sentencing, considered either singly
or in the aggregate, meets this standard.  <u>United States v.</u>
<u>Bokum</u>, 73 F.3d 8, 12 (2d Cir. 1995); <u>Graziano v. United States</u>,
83 F.3d 587 (2d Cir. 1996).

Finally, Green claims that his counsel on appeal was
ineffective.  In support of this claim he alludes to many of the
same issues that his counsel allegedly failed to pursue at trial
and at sentencing.  Under <u>Strickland</u>, a prisoner must show cause
and prejudice in order to succeed on a claim of ineffective
assistance of counsel.  <u>Strickland</u>, of course, applies to claims
of ineffective assistance of appellate as well as trial counsel.
See <u>Mayo v. Henderson</u>, 13 F.3d 528, 533 (2d Cir. 1994).

In an effort to show that appellate counsel's failure to
raise claims constitutes a constitutionally deficient performance,

3

it is not sufficient merely to show that counsel omitted a non-frivolous argument, for counsel does not have a duty to advance every non-frivolous argument that could be made.  See Jones v. Barnes, 463 U.S. 745, 754 (1993).  However, a petitioner may establish a constitutionally inadequate performance if he shows that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker.

That test has not been met here as Green has shown neither "cause" nor "prejudice."  Each of the omissions claimed by Green on the part of his appellate counsel involves issues that are insubstantial or frivolous.  Specifically, Green claims that appellate counsel was ineffective for his failure to raise six claims.  Since each of them was without merit, appellate counsel was not ineffective in failing to pursue them.  Specifically (1) co-conspirator's statements were not improperly admitted; (2) statements outside the time of the conspiracy were not properly admitted; (3) statements by co-conspirator were not properly admitted; (4) the calculation of loss and enhancement for obstruction of justice and more than minimal planning were proper; (5) it would have been futile for counsel to seek suppression of Green's statements to the IRS or dismissal of the count; and (6) the wire fraud and money laundering convictions were supported by the evidence.  In sum, since appellate counsel did nothing demonstrably improper, Green falls substantially short of making

4

the showing required by <u>Strickland</u> since he has not shown "that counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment."  466 U.S. at 687.

### CONCLUSIONS

For the reasons set forth herein and in the government's memorandum filed March 5, 1998, the Petition, in all respects, is denied.  The Clerk shall file a final judgment dismissing the Petition.  The Court determines that since any appeal from the dismissal of this Petition would be meritless, the Court would decline to issue a Certificate of Appealability.  <u>See</u> 28 U.S.C. 2253(c)(1).  Nor would the Court grant <u>in forma pauperis</u> status.  <u>See</u> 22 U.S.C. § 1915.

SO ORDERED:

Barrington D. Parker, Jr.
United States District Judge

Dated:    White Plains, NY
          July 8, 1998

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - -X

James R. Green,

        Petitioner,

    -against-

United States of America

        Respondent.

- - - - - - - - - - - - - - - - - - - -X

98 CV 0090 (BDP)

(95 CR 0057 (BDP)

**JUDGMENT**

    Whereas the above named petitioner having filed a petition for a Writ of Habeas Corpus, pursuant to 28, U.S.C., Section 2254, and the said petition having been submitted to the Honorable Barrington D. Parker, U.S.D.J., and the Court thereafter on July 8, 1998, having handed down its memorandum and order dismissing the said petition, The Court determines that since any appeal from the dismissal of this Petition would be merit less, the Court would decline to issue a Certificate of Appealability.  See 28 U.S.C. 2253 (c)(1).  Nor would the Court grant in forma pauperis status.  See 22 U.S.C. } 1915, it is,

    **ORDERED, ADJUDGED AND DECREED**: That the petition be and it is hereby dismissed.  The Court determines that since any appeal from the dismissal of this Petition would be merit less, the Court would decline to issue a Certificate of Appealability.  See 28 U.S.C. 2253 (c)(1).  Nor would the Court grant in forma pauperis status.  See 22 U.S.C. }1915.

Dated: White Plains, N.Y.

    July 9, 1998

                                                        Clerk

**MANDATE**

S.D.N.Y.
98-CV-90
Parker, J.

# United States Court of Appeals
### FOR THE
### SECOND CIRCUIT

U.S. DISTRICT COURT
W.P.
JAN 26 2000
S. D. OF N.Y.

At a stated Term of the United States Court of Appeals for the Second Circuit, held at the United States Courthouse, Foley Square, in the City of New York, on the   21   day of January  two thousand

Present:

      Hon. Pierre N. Leval,
      Hon. Richard J. Cardamone,
      Hon. Fred I. Parker,
          *Circuit Judges.*

---

James R. Green,

          Petitioner-Appellant,

      v.

                                          98-2710

United States of America,

          Respondent-Appellee.

---

Appellant has filed, *pro se,* a motion for a certificate of appealability. Upon due consideration, it is ORDERED that the motion is denied and the appeal is dismissed. The appellant has not made a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c).

                    FOR THE COURT:
                    Karen Greve Milton, Acting Clerk

                    By: *Lucille Carr*

JAN 21 2000

USCA Order 3

— ISSUED AS MANDATE: 1/21/00 —

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
UNITED STATES COURT HOUSE
40 FOLEY SQUARE
NEW YORK 10007

**ROSEANN B. MACKECHNIE**
CLERK

At a stated term of the United States Court of Appeals for the Second Circuit, held at the United States Courthouse, Foley Square, in the City of New York, on the seventeenth    day of March two thousand.

---

JAMES R. GREEN,

        Petitioner-Appellant,

v.

UNITED STATES OF AMERICA,

        Respondent-Appellee.

Docket No. 98-2710



---

A petition for panel rehearing and a petition for rehearing en banc having been filed herein by the appellant James R. Green.

Upon consideration by the panel that decided the appeal, it is Ordered that said petition for rehearing is **DENIED**.

It is further noted that the petition for rehearing en banc has been transmitted to the judges for the court in regular active service and to any other judge that heard the appeal and that no such judge has requested that a vote be taken thereon.

        **FOR THE COURT**

        ROSEANN B. MACKECHNIE, Clerk

        By: _Beth J. Meador_
        Beth J. Meador,
        Administrative Attorney

p o ccc
inbancdn_frm

**EXHIBIT 1A**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
THE UNITED STATES OF AMERICA

        -against-                         **ATTORNEY'S AFFIRMATION**

JAMES R. GREEN                         95 CR. 0057 (BDP)

                        Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

    DOMENICK J. PORCO, being an attorney duly admitted to practice in this Court,

affirms the following to be true under penalty of perjury.

    1  I am the attorney for the above-named defendant and I submit this affirmation in

support of defendant's motion to set aside the jury's verdict. The allegations set forth herein are

based upon Mr. Green's affidavit, annexed hereto, my review of the trial transcript, and, where

so stated, upon my own recollection of the events.

    2  The allegations in Mr. Green's affidavit concerning Mr. Briscoe's performance are

fully supported by what took place before the Court, both prior to and during the trial. For

example, it is absolutely true that on the eve of trial Mr. Briscoe made an application to the Court

to be relieved and that he gave as the reason therefor Mr. Green's lack of funds. It is equally true

that Mr. Briscoe had absolutely no familiarity with the Federal Rules of Evidence or criminal trial

experience, as evidenced by Mr. Hendrix's affidavit annexed hereto and as evidenced by Mr.

Briscoe's woeful attempts to introduce documents into evidence at trial.

    3  The question for the Court, I submit, is not whether Mr. Briscoe was familiar with

basic concepts of federal criminal law, either substantive or procedural. I submit the answer to

that question is clearly "no" Instead, the issue for the Court is how and to what extent Mr

Briscoe's incompetence prejudiced his client. To that issue, I submit the following

    4 Mr Green's affidavit establishes that Mr Briscoe was involved in this case as Mr.

Green's attorney from its inception, long before trial, and that right up to the filing of the

indictment he provided absolutely no assistance to Mr Green. No investigative effort was

undertaken by Mr Briscoe. Indeed, even after Mr Green was served with a subpoena for the

business records of Technical Solutions, Mr. Briscoe made no effort to familiarize himself with

the documents his client was about to submit.

    5 After the indictment, Mr. Briscoe permitted, indeed advised, Mr. Green to be

questioned by Ms Guss and the investigating agents under the auspices of a possible cooperation

agreement even though, given his client's unwavering claim of innocence, such an agreement

could not possibly be reached An attorney experienced in federal criminal cases knows that a

defendant cannot become a Government witness against accomplices to a crime of which he

claims he is innocent An attorney faced with a Government overture of a cooperation agreement

with his client must first determine by speaking to his client whether the client is, in fact, able and

then willing to provide the kind of information the Government is looking for Once the client

tells the attorney he is innocent of the charge, the only avenue left to counsel is to advise the

Government that no cooperation is available. Here, instead, Mr Briscoe induced Mr Green to be

questioned by his prosecutor and to reveal his entire defense without any hope of any benefit in

return The prejudice to the defendant from revealing his defense to the prosecutor is self-

evident, and it matters not that the Government did not introduce any of his statements at trial.

    6 Mr. Briscoe was obviously unfamiliar with the procedures available to him as assigned

counsel under the Criminal Justice Act for the subpoenaing and attendance of defense witnesses at no cost to his indigent client. As the Court is aware, an indigent defendant is entitled to the assistance of the United States Marshall's Service in securing the attendance of witnesses, including the payment at public expense of the travel and lodging costs as well as the service of process. An indigent defendant is entitled to have investigative and other services paid for under the Criminal Justice Act. All that is required is that an application be made to the Court, justifying the expense. Best of all, the application is submitted ex parte, so that there is no risk of alerting the opponent. Obviously unaware of any of these benefits to which his client was entitled once the Court assigned him to represent Mr. Green, Mr. Briscoe abandoned any effort to secure important defense witnesses.

7. That Mr. Briscoe considered the witnesses' testimony important to his client's cause is reflected in his attempt to introduce their written statements during his direct examination of Mr. Green. (Trial Transcript at pp. 1897-1902). The documents were clearly hearsay and the Court correctly prohibited their introduction. However, even in the absence of the authors-witnesses, whom Mr. Briscoe did not know how to get to court, the documents had value as fodder for cross-examination of Robert Gaines, perhaps the Government's most important witness. Had Mr. Briscoe been familiar with the rudimentary rules of evidence he could have used the facts recited in the documents to question Mr. Gaines.

8. From the opening statement right through summation, Mr. Briscoe asserted to the jury that they could not convict his client solely on the uncorroborated testimony of the co-conspirators and framed his entire defense strategy on that basis. Indeed, in a case as complicated as this Mr. Briscoe submitted that erroneous legal proposition as his only written request to

3

charge. When the court, quite correctly, failed to so charge and in fact instructed the jury to the contrary, Mr. Briscoe persisted

> MR. BRISCOE. Your Honor, I feel that the co-conspirator testimony must be corroborated by some other credible evidence. I don't think you can --
>
> THE COURT: That's a state law rule but I don't believe that applies in this court, Mr. Briscoe.
>
> MR. BRISCOE. You are telling me that all three of those defendants, you can convict my client --
>
> THE COURT You show me some --
>
> MR. BRISCOE solely on those testimonies alone? They all had motive to lie
>
> MS. GUSS: Your Honor, I believe it is the law. In fact, cases are brought in Federal Court sometimes because of the corroboration ruling in the state that doesn't apply to the Federal Government.
>
> MR. PORCO: That's correct.

Trial Transcript, p 2480-2481

    8    I remind the court that the rule of which Mr. Briscoe was so totally ignorant is a basic one in federal criminal law  His complete reliance on that fundamental misconception as the centerpiece of his client's defense defines ineffective assistance of counsel. But Mr. Briscoe's incompetence did not end there .

    9. During Mr. Green's cross-examination, Ms. Guss asked him about the business documents of Technical Solutions  that were subpoenaed in the grand jury  The colloquy went as follows:

Q  You turned over Technical Solutions' documents, right?

A  Yes, I did

Q  And you turned over everything that you have because that's basically what was subpoenaed?

A.  I turned over everything I had at the time

Q.  You didn't turn over any documentation for $17,000 in expenses, did you?

A  I turned over enough documents that will add up to that, the checks I gave you

Trial Transcript, p  1986-1987

10  The questioning of Mr. Green with respect to his production of subpoenaed corporate

records violated his Fifth Amendment privilege against self-incrimination

> The fact that the custodian [of corporate records] is not
> entitled to refuse the produce the documents does not,
> however, mean that his act of production may be used
> against him.  Because the custodian acts as a represent-
> ative, the act is deemed one of the corporation and not
> the individual   Therefore, the Government may make
> no evidentiary use of the "individual act" against the
> individual.  For example, in a criminal prosecution
> against the custodian, the Government may not intro-
> duce into evidence before the jury the fact that the
> subpoenas was served upon and the corporation's
> documents were delivered by one particular individual,
> the custodian.

United States v  Doe, 959 F.2d 1158 (2d Cir. 1992), quoting Braswell v  United States, 487 U.S

99 (1988) (emphasis added)   Yet, in spite of this clearly improper questioning of his client, Mr

Briscoe remained silent, posing no objection.

11  Carl McDonald was extensively cross-examined by me on behalf of William Green

and the jury was made fully aware of his prior lies, fabrication and inconsistent statements. Yet,

Mr. Briscoe provided him with an opportunity to explain away his previous lies and at the same

time throw serious innuendos against Mr. Green. I refer to the following colloquy.

> Q. Why are you telling the truth, so inconsistent that
> you're telling the truth now as opposed to the past?
>
> A. I have told bits of the truth in the past, never gave
> the whole story.
>
> Q. And now --
>
> A. And now, as I said before, certain things have occurred
> that I felt there was no longer a threat to my family or to
> myself. I'm now going forth and telling the truth.
>
> Q. What are those threats that you're talking about?
>
> A. I felt that there was always the threat to my family.
>
> Q. Now you're not with your family. Why do you think
> it's not a threat now?
>
> A. You're forcing me to say this, and I will say it.
>
> MR. PORCO: I ask for a sidebar, Your Honor.

Trial Transcript, p. 391. At the sidebar, Ms. Guss informed the Court and counsel that the

witness was about to refer to threats allegedly made against him and his family by the defendant

James Green. Mr. Briscoe was compelled to withdraw the question, leaving the jury with an

unmistakable impression that some damaging information had just been kept from them. Shortly

after that episode, Mr. Hendrix was compelled to interrupt Mr. Briscoe again as he was about to

inflict some damage on Mr. Stancil. After conferring with Mr. Hendrix, Mr. Briscoe withdrew

the objectionable question. (Trial transcript, p. 396) Moments later, it was my turn again to

6

interrupt and ask for a sidebar" At the sidebar the Court noted that Mr Briscoe's examination of McDonald was "getting repetitive" After the sidebar, Mr Briscoe abruptly ended the examination (Trial transcript, p. 400)

12. I submit to the Court that Mr Briscoe was woefully unqualified to represent a defendant in a federal criminal trial, particularly one of this complexity I submit his complete lack of unfamiliarity with federal substantive and procedural law prevented him from offering any support to the defense his client asserted and caused him to rely instead on a legal theory that had no validity whatsoever and that the Court was compelled to discredit in its instructions to the jury I submit Mr Briscoe, with absolutely no staff to assist him, was not equipped to address a case of this type, with the volumes of documents that required a herculean effort to absorb and put to effective use at trial.

13 I further submit that the allegations contained in Mr Green's affidavit and in Mr Hendrix's affirmation, as well as the events that occurred at trial before this Court raise serious questions that need to be explored further at a hearing

WHEREFORE it is respectfully requested that the Court grant the defendant's motion to set aside the verdict to the extent of directing that a hearing be held, or that such other and further relief be granted as is just and proper

Dated: Scarsdale, New York
    February 6, 1996

DOMENICK J PORCO

**EXHIBIT 2**

*Exhibit L*

## IN THE DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

THE UNITED STATES OF AMERICA

      -against-

JAMES R. GREEN,

          Defendant.

AFFIRMATION

95 CR 0057 (BDP)

    RICHARD W. HENDRIX, being an attorney duly admitted to practice before the courts of the State of Georgia and the United States District Court for the District of Georgia, affirms the following to be true under penalty of perjury:

    1.    I was the attorney for Joseph Stancil, one of the original defendants in the above-entitled matter, who, together with James and William Green, was tried before this Court and a jury during the month of October, 1995. My client and William Green were acquitted of all charges. I am executing this affirmation at the request of Domenick J. Porco, who I am advised now represents the defendant James Green.

    2.    At the trial of this action, James Green was represented by one Percy Briscoe, who I had not met prior to the commencement of the trial. Shortly before the commencement of jury selection Mr. Briscoe, Mr. Porco, who then represented William Green, and I met to discuss whether there existed the possibility that conflicting defenses would be raised. This concern was first expressed by Mr. Porco and me to each other and after an initial discussion between us we decided to address the issue with Mr. Briscoe.

    3    After the question of potentially conflicting defenses was put to rest, our discussion turned to the general nature of the case, particularly its legal and factual complexity.

It was during this phase of the conversation that Mr. Briscoe made statements which indicated to me that this may have been the first federal criminal case he had ever been involved with.

4.     As the trial progressed, Mr. Briscoe's unfamiliarity with the rules of evidence and his cross-examination of some of the Government's witnesses became a matter of concern and discussion between Mr. Porco and me.  On several occasions it became necessary for either Mr. Porco or myself to ask for side-bar conferences with the Court or to interrupt Mr. Briscoe and confer with him in reaction to questions put by him to the witnesses.

5.     During the period of the jury's deliberations Mr. Briscoe and I spent much time together discussing the case, including the issues to be dealt with at the sentencing in the event of a conviction  Aware of Mr. Briscoe's apparent unfamiliarity with the federal rules of criminal procedure, I informed him that in the event his client was convicted it would be necessary to familiarize himself with the Sentencing Guidelines.  Mr. Briscoe acknowledged his lack of familiarity with the Guidelines.  At his request, I assured him that I would assist him in any way that I could to address the issues that inevitably would be dealt with at sentencing in the event of a conviction.

6.     After the jury's verdict, as my client and I were leaving the courthouse, I told Mr. Briscoe that notwithstanding my client's acquittal I intended to honor my promise of assistance.  On November 17, 1995 I wrote to Mr. Briscoe, with a copy to Mr. Porco, a lengthy letter identifying for him the issues he would be facing under the Guidelines and suggesting how he might wish to address them

7.     I have not spoken to Mr. Briscoe since I left the courthouse after the jury rendered its verdict.

DATED:  January 31, 1996
Atlanta, Georgia

_____
Richard W. Hendrix
Georgia Bar No: 346750

Sworn and subscribed before me
this 31st day of January, 1996

_____
Notary Public

MY COMMISSION EXPIRES NOV. 22, 1996

EXHIBIT 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
THE UNITED STATES OF AMERICA

       -against-                      **AFFIDAVIT**

JAMES R. GREEN                    95 CR. 0057 (BDP)

                      Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

STATE OF NEW YORK

COUNTY OF WESTCHESTER

    **JAMES R. GREEN,** being first duly sworn, deposes and says:

    1. I am the defendant in the above-entitled action and I submit this affidavit in support of this motion to set aside the jury verdict entered against me on November 1, 1995. The basis for the motion is that I have been denied the effective assistance of counsel in the defense of this case, as the facts and circumstances hereafter recited will establish.

## A. THE PRE-INDICTMENT STAGE

    2. In the late fall of 1992 an article appeared in a local newspaper in the Poughkeepsie area reporting on the arrest of Carl McDonald, an employee of the IBM Corporation, for the theft of millions of dollars of computer equipment from IBM. The article reported that McDonald had committed his offense with the aid of other former IBM employees. My name was mentioned in that connection. The article further reported that McDonald was being prosecuted by the Ulster County District Attorney.

1

3. I had known McDonald while we both worked at IBM and for some months prior to his arrest had been associated with him in several business ventures. After reading the article, I contacted Percy Briscoe, an attorney in Wappingers Falls, New York, who I had first come to know some years before when he was in IBM's General Counsel's office. After he left IBM and began a private practice Mr. Briscoe represented me when I purchased my home and when, a few months prior to McDonald's arrest, I incorporated the business "Technical Solutions", of which more will be said in this affidavit. At the time of his arrest in November of 1992 Carl McDonald was a partner of mine in Technical Solutions.

4. During my meeting with Mr. Briscoe following McDonald's arrest, we discussed the allegations in the newspaper article and the nature of my business dealings with McDonald. Mr. Briscoe suggested that he would look into the matter of McDonald's arrest and report back to me. At that time Mr. Briscoe assured me that even if McDonald had implicated me in his crime I could not be prosecuted for it because the law prohibited a criminal conviction on the word of an accomplice alone.

5. For the ensuing several months I continued my association with McDonald, both social and business, convinced that he was genuinely fighting the charges against him and that he had not in any way implicated me. Then, in April of 1993, while McDonald was at my home, FBI agents, accompanied by local police officers, came to arrest him on additional charges of stealing from IBM through an accomplice in North Carolina. The following day I again met with Mr. Briscoe to advise him of what had occurred.

2

6.   In August of 1993 FBI agents came to my business and served me with a subpoena, directing me to appear before a federal grand jury in White Plains and to bring with me all business and financial records of Technical Solutions Specialists, Inc.  At the time I was served with the subpoena I was informed that it was related to an investigation into the theft of IBM equipment by Carl McDonald and others.   The following day I met with Mr. Briscoe in an effort to determine what my rights and obligations were with respect to the subpoena.  Although I brought the subject business records with me,  Mr. Briscoe did not review them,  advising me that I had no alternative but to comply with the subpoena.   Some time in September of 1993 I appeared before the grand jury with the records of Technical Solutions and was questioned with respect to them.

### B. THE POST-INDICTMENT, PRE-TRIAL STAGE

7.  In January of 1995 I was arrested on the instant indictment.  Shortly after my arraignment and release on bond I engaged Mr. Briscoe to represent me.  I paid him $2,500 as a retainer and agreed to pay additional monies during the course of the case.  Although Mr. Briscoe did not give me a specific fee amount he indicated that it would probably be "around $10,000".  At that time I had no reason to question whether this was the kind of case Mr. Briscoe could deal with.  I believed that he was an experienced criminal lawyer and, as he stated to me, that he was "a tiger in court".

8.   Several weeks after the indictment was filed Mr. Briscoe began receiving from the Government numerous documents pertaining to the case.  Mr. Briscoe found it increasingly difficult to review the documents with me.  He had no staff, not even a secretary or receptionist

3

and most of the time our discussions and review of the documents were interrupted by telephone calls, each of which Mr. Briscoe had to attend to. Some of the documents I recognized since they were photocopies of what I had submitted in response to the grand jury subpoena; most, however, I had never seen before.

9. Because of Mr. Briscoe's inability to sit with me for any length of time and analyze the volumes of paper the Government was providing I was compelled to review each document myself and, with respect to those I recognized, to give Mr. Briscoe a written summary of what each represented. This was essential because Mr. Briscoe had not reviewed those documents prior to my submitting them to the grand jury and thus was completely unfamiliar with them. In addition, I provided Mr. Briscoe with a list of witnesses and a written summary of the information each witness could provide in my defense. Thus, by the summer of 1995 I had given Mr. Briscoe what I believed was a clear factual understanding of the case and my defense to the charges leveled against me.

10. Some time in May or June of 1995 Mr. Briscoe advised me that he had been contacted by Assistant United States Attorney Barbara Guss regarding my possible cooperation with the Government against other persons alleged to have been involved in the charged offenses, more specifically John Lynch and his associates. I reminded Mr. Briscoe that, as I had discussed with him in detail previously, I did not know Lynch or any of his associates, that I had never dealt with nor seen any of them and that I had absolutely no information to give regarding their alleged participation in the theft of IBM computer cards. In spite of my unequivocal assertion of innocence to him, Mr. Briscoe advised me that it would be beneficial for me to meet with Ms. Guss and the investigating agents to see if some sort of a "deal" could be worked out between us.

4

Relying on that advice, I agreed to meet with the prosecutor in Mr. Briscoe's presence.

11.  The meeting turned out to be nothing more than an inquisition.  I was told that before any cooperation agreement could be discussed I had to answer their questions "truthfully" and admit to my own part in the crimes.  I answered all of the questions put to me, giving detailed information of what I knew, what I did, when I did it and with whom.  But the answers were not to the prosecutor's liking because I never deviated from my assertion of innocence and the information I imparted was entirely consistent with that assertion.  By the end of the meeting, the prosecution team had my entire defense laid out on the table before them.  Mr. Briscoe said not a word during the entire time.

12.  At Mr. Briscoe's suggestion, apparently in response to overtures from Ms. Guss, I met with Ms. Guss on at least one other occasion, again in exploration of a possible cooperation agreement.  On the subsequent occasion I felt that she was interested in having me become an informant in connection with drug investigations then going on in the Poughkeepsie area.  I promptly informed her that I had absolutely no knowledge of anyone involved in drugs dealing and that I could not possibly help her in that regard.   Ms. Guss then expressed an interest in having me testify against my co-defendants, including my brother, William Green.  I reminded her that I had done nothing illegal and that I certainly had no information to give regarding either William Green or Joseph Stancil.

13.  Throughout the period following my indictment I suffered severe financial problems.  Indeed, I was unable to make my monthly mortgage payments and ultimately I lost my home.  By the end of the summer I informed Mr. Briscoe that for the present I would be unable to honor my fee commitment to him.  Thus, even as the scheduled trial date approached Mr. Briscoe had not

received any additional funds from me since the initial retainer. With that, Mr. Briscoe advised me that under those circumstances he had no alternative but to withdraw from the case. Thus, during one of the last pre-trial conferences with the Court in September of 1995 he made that application, but the Court, noting that trial was about to commence, denied the request. However, the Court assigned him to represent me under the Criminal Justice Act.

14. As the trial commenced in early October, Mr. Briscoe had not interviewed any of the witnesses whose names I had given him. Some of the witnesses would have testified about my reputation in the community. In fact, I gave Mr. Briscoe the names and whereabout of a number of my former co-workers at IBM as well as customers of Technical Solutions. Others witnesses, one in particular who was at my home regularly during the relevant period, would have directly contradicted grand jury testimony by Carl McDonald to the effect that I had stored some of the stolen memory cards in the basement of my home. Four other witnesses would have testified about the nature of my business relationship with both Carl McDonald and Robert Gaines, the two principal Government witnesses against me at trial. Others, two of whom were business partners of Robert Gaines, would have testified about the deceitful practices, treachery and general dishonesty of Robert Gaines in their dealings with him.

15. I pointed out to Mr. Briscoe that we were running out of time and that arrangements had to be made with the witnesses, many of whom were from out of state. Mr. Briscoe informed me that because of my financial plight I could not afford to pay for the witnesses' travel and lodging expenses, that in addition some of them had to be subpoenaed and that there was a cost associated with serving the subpoenas which I obviously could not afford. Mr. Briscoe convinced me that we would have to forego calling them. Specifically regarding the two former business

6

partners of Robert Gaines, both of whom were from Maryland, Mr. Briscoe advised me that we did not require their testimony since we had documents from them setting forth the substance of their testimony.[1] He assured me that in any event because the Government's case against me consisted entirely of "uncorroborated co-conspirator" testimony the Government would be unable to prove its case. He repeated several times that under the law no person could be convicted on the uncorroborated word of an accomplice and that in his opinion the Government had no such corroboration. Ultimately, Mr. Briscoe called but one witness on my behalf.

## C. THE TRIAL

16. Once trial got under way and testimony was being received Mr. Briscoe recognized and acknowledged to me that this was the most difficult case he had ever had, both because of the sheer volume of documents involved and the number of witnesses. Indeed, Mr. Briscoe had received additional volumes of documents just prior to the commencement of trial, consisting primarily of prior testimony and/or statements of witnesses. Although he made an effort to review them, the task was beyond his capacity. To the contrary, it was not until after several witnesses had already testified, during the cross-examination of one of them by my present counsel, Mr. Porco, that Mr. Briscoe realized the extent of his unfamiliarity with the contents of the documents. At the conclusion of Mr. Porco's cross-examination, Mr. Briscoe, in my presence, asked Mr. Porco the source of the information he had used to question the witness. Mr. Porco informed him that it was in the "3500 material".

17. From that point on in the trial, in a frantic effort to catch up, at the end of each trial

---

[1] Mr. Briscoe ultimately attempted to introduce those documents into evidence but was prevented from doing so on the Government's objection that the documents constituted inadmissible hearsay.

day Mr. Briscoe and I would go to his office and review the documents. Typically we stayed until the early morning hours, by which time both he and I were completely exhausted. The next morning we would meet by 7:30 A.M. for the trip to the courthouse. On several occasions during the trial Mr. Briscoe fell asleep, requiring me to nudge him awake.

### D. THE POST-TRIAL STAGE

18. After my conviction, I was compelled to address the question of my sentence, a topic that I had not previously discussed with Mr. Briscoe. For the first time he candidly admitted to me that he was utterly unfamiliar with federal sentencing law. He stated that he had discussed the topic with Mr. Porco and with Mr. Richard Hendrix, counsel for Joseph Stencil, during the jury deliberations and that each had offered his assistance to him in dealing with the sentencing process if that became necessary.

19. I realized then that I could no longer continue with Mr. Briscoe as my attorney. Some time in late December, 1995 I spoke to Mr. Porco and explored the possibility of having him represent me. Ultimately, I did engage Mr. Porco and Mr. Briscoe was relieved by the Court from any further obligation to represent me.

20. Based on discussions I have had with Mr. Porco, I am now aware that Mr. Briscoe was not competent to handle a federal criminal trial of the complexity and magnitude of this case and that he should have informed me of his lack of experience in federal criminal trials when I first sought his representation.

21. I rely on my attorney's affirmation and legal arguments, annexed to these moving papers, in support of my application for a new trial on the ground that I was deprived of my right under the Sixth Amendment to the United States Constitution to the *effective* assistance of counsel.

8

WHEREFORE, I respectfully request that the Court vacate the jury's verdict entered against me and that I be granted a new trial.

/S/

Sworn to before me this
6th day of February, 1996

/S/

EXHIBIT 4

# Ex-IBMer accused in fraud plot

## Scam worth $20 million plus

-4/14/99

**By Craig Wolf**
Poughkeepsie Journal

WHITE PLAINS — A former manager for IBM Corp. faces federal indictments charging he participated in a bribery scheme to get more than $20 million worth of IBM computers and computer parts by fraud, the U.S. attorney in New York said Wednesday.

Other IBM executives also took bribes, the attorney said. A Florida businessman was also indicted Wednesday.

Robert St. Germain, 55, of Town of Union Vale, was indicted by a federal grand jury in White Plains Wednesday, according to Barbara Guss, the assistant U.S. attorney in charge of the prosecution.

Also indicted was Lawrence Laspina, 41, of Fort Lauderdale, Fla., whose companies allegedly bought IBM computers and parts.

The indictments were part of a broad investigation into related cases in which 11 defendants have entered guilty pleas to various charges, the prosecutor said. The investigation is continuing.

Guss declined to identify the other defendants Wednesday. In a press release, she asserted that about $575,000 in bribes were paid not only to St. Germain but to "other executives at IBM" in connection with the scheme.

IBM's spokeswoman on legal matters was not available by press time Wednesday. The company does not usually comment on pending legal matters. Efforts to contact both St. Germain and Laspina

were unsuccessful.

Several other cases involving IBM computer parts have come to law authorities' attention in recent years, but the prosecutors would not say whether they were connected.

### Handled sale of parts

The indictment says that from about 1990 to July 1993, St. Germain managed the Reutilization Department of IBM, which oversaw the sale and dismantling of surplus computers and parts by outside brokers, including Recycler's Consulting Group Inc. The indictment charges that an RCG owner, not identified, paid the bribes to St. Germain and other IBM executives. According to the press release, Laspina "provided a substantial portion of the bribes to St. Germain and other IBM executives."

The scheme was allegedly to fraudulently sell IBM computers and computer parts, though the contract forbid sales without permission, the attorneys said.

Both men are charged with conspiracy to commit wire fraud; to transport in interstate commerce more than $20 million in goods obtained by fraud; and to defraud the Internal Revenue Service by concealing bribes and earnings.

St. Germain is charged with signing false tax returns. Laspina also faces other charges. Penalties on each count run to 5 years if convicted, with fines from $250,000.

News stuns associates    **5A**

---

## Indictment stuns ex-IBMer's colleagues

**By Abigail Klingbeil**
Poughkeepsie Journal

Some local residents were surprised by news that Town of Union Vale resident Robert St. Germain was indicted Wednesday by a federal grand jury in White Plains.

The indictment alleged that St. Germain, who managed IBM's Reutilization Department from 1990 to July 1993, joined in a scheme with Lawrence Laspina, whose companies bought IBM computers and parts. Laspina paid about $575,000 in cash bribes to St. Germain and other IBM executives to allow him

to sell surplus IBM computers.

"I knew him and I thought very highly of him as a matter of fact," said City of Poughkeepsie resident Rudolph Effram, who retired from IBM in 1992.

"He was an excellent manager. I think he was a very competent person at that time," he said.

"It's very disturbing to hear something like this," said Millbrook Mayor Gary E. Ciferri.

Millbrook school board member Jeffery Benedick said he had met St. Germain at athletic activities at the high school.

"I knew he had w___

Benedick said, "Nothing in the encounters I've had with him would lead me to believe anything like this," Benedick said of the charges.

Alan Binder, also a Millbrook school board member, said he knew St. Germain casually for many years. "He's very involved in the community. Very positive man," Binder said. Binder confirmed that St. Germain is an assistant softball coach at Millbrook High School.

A man who answered the telephone at the St. Germain household said, "He doesn't live here," when ask___ to speak with Robert St. Gen___

**EXHIBIT 5**

in the record for the determination that the alleged conspiracy continued beyond January 8, 1993. The duration and termination of conspiracy is determined by particular facts of each case. See <u>United States v. Varella 692 F.2d 1362 1362(11th cir. 1982), United States v. Knuckles 581, F.2d 305,313 (2d cir. 1978)</u>. However a conspiracy is generally deemed to terminate when its objectives are completed or abandoned. <u>United States v. Chalarca 95 F.3d 239(2d cir. 1996), United States v. Wong 40 F.3d 1347, 1366(2d cir. 1994), United States v. Lovell 16 F.3d 494,497(2d cir. 1994)</u>. The alleged conspiracy ended with the last overt act. The last overt act was alleged by the government to be January 8, 1993. However the alleged co-conspirator was found not guilty of all charges. Thus the last overt act was November 1992. Any alleged concealment after alleged conspiracies' objectives have been met or abandoned, cannot be said t further the original conspiracy. The supreme court has unambiguously held that act of concealment are not part of the original conspiracy. <u>Grunewald v. United States 353 U.S. 405</u>. In the instant case at bar, the conspiracy ending has a direct relationship to government witness testimony. The testimony of Robert Gaines was admitted after conspiracy had ended, Carl McDonald and statements by Harold Jackman plus exhibits were admitted. This evidence by the government was clearly admitted after the conspiracy had ended and wanted to inculpate the petitioner.

### C.) TRIAL COUNSEL FAILED TO INVESTIGATE INTERVIEW AND SUBPOENA WITNESS GIVEN TO HIM IN ADVANCE OF TRIAL BY PETITIONER.

Defense counsel's failure to go to scene of defendant's arrest to locate potential witnesses, interview witnesses whose names had been given to him by defendant or hire investigator

to track down potential witnesses was ineffective assistance of counsel.  Quote, <u>U.S. v.</u>
<u>Gray 878 F.2d 702 (3rd cir. 1989), Jones v. Wood 114 F.3d 1002 (9th cir. 1997)</u>.  In the
case at bar, counsel failed to investigate, subpoena or interview at least seven (7)
witnesses given to him by petitioner nine (9) months before trial.  These witnesses would
have directly affected testimony by Carl McDonald, Robert Gaines, Lark Suddith and the
government theory that Technical Solutions was not a viable business and was just started
to steal memory cards.  The first witness, Randy Green, is the petitioner's nephew.  <u>Randy</u>
<u>Green</u> worked for petitioner a number of years.  Carl McDonald knew Randy would have
directly testified that in the summer of 1992 he worked for petitioner as a maintenance
man, painting petitioner's house and garage.  He also worked for petitioner in delivering
and picking up laser toner cartridges at customers' offices.  Petitioner's business was to
recycled these cartridges.  Randy would testify that he saw no parts in the petitioner's
basement for he stored paints there all summer and fall.  Randy would have testified that
he was familiar with the storage unit at Arnoff storage because he helped petitioner put
restaurant glasses, dishes and silverware in it, and he helped petitioner clean it out.  He
would have testified that there was no memory cards in the unit.  Randy would also testify
that he never helped any one put memory cards in Guardian storage.  He also would
testify that Guardian storage was never used to store any memory cards, at least not by
petitioner, as Carl McDonald stated in his testimony.  Randy would testify that he knew
Lark Suddith because he shared an apartment with him.  Randy would have testified that
petitioner thought Lark sold drugs in his (petitioner's) restaurant and he didn't like or trust
Lark.  Randy would testify that petitioner would have never hired Lark for anything and

that petitioner was looking for him, Randy, when he called his house. Lark testifies that petitioner called him and told him to pick up trucks containing memory cards. The second witness counsel failed to interview and call was <u>Laval Moore</u>, owner of an accounting and parts brokerage firm in 1992. Laval would have testified that Robert Gaines told him to call petitioner and that petitioner worked for him as his representative in New York. Laval would have testified that he sold petitioner personal computers. Robert Gaines testified that he didn't authorize any sale to petitioner and he didn't get involved with petitioner on personal computers. Laval Moore would have directly contradicted Gaines. The third witness not interviewed or called is <u>Dr. Stanley King</u>. Dr. King would have testified that petitioner and Carl McDonald worked for Gaines, and that they put together the sales of LEEO stock and LEEO Manufacturing for Gaines. Gaines testified under oath that petitioner didn't work for him and that the money paid to Carl was from memory cards and not for work. Gaines also stated that the money wired to him was lost. Dr. King would testify that at the same time Gaines said the money was lost, he was buying $30,000 worth of LEEO stock and paying $25,000 more for the LEEO business. Gaines had previously testified he borrowed $4,500 from petitioner a few months earlier to save his home. Thus he had no money. Dr. King would have also testified that Gaines started a new manufacturing business with the LEEO assets called Data Systems Manufacturing and Engineering (DSME), and that this business is still in effect today, under Gaines' wife. No where is petitioner mentioned as part of this business. The fourth witness is <u>Mr. Hank Walker, president of then Total Computers of Maryland</u>[12]. Mr. Hank Walker would have testified that Carl McDonald and petitioner worked for Gaines when petitioner and

---

[12] see Exhibit E

McDonald helped him put together his bid proposal to Nations Bank, on toner cartridges. Russell Green is the fifth witness. Russell Green is the petitioner's brother, who would have testified that petitioner loaned him $4,000 to open his business in July 1992. Gaines testified that petitioner told him he gave the money to William Green, petitioner's other brother, who was acquitted of this crime. The sixth witness not subpoenaed by counsel was the IBM Poughkeepsie general manager in 1992, Frank Jones. Frank could have testified to statements he made in interview with Carl McDonald when he stated that McDonald wasn't the only one stealing the cards and that it was an internal problem and that he didn't know that this was a image problem or a business problem. Frank could have testified that the memory cards did not need a climate control environment for storage and that the cards are stored in an ordinary warehouse. The government's theory is that the petitioner wanted to rent a climate controlled box from Guardian storage to store memory cards which needed to be stored under controlled conditions. Counsel failed to investigate to find out that these cards are stored at normal temperatures. Frank Jones could have directly testified to this. Frank Jones also could have testified to the skills of petitioner who worked directly for him in IBM Brooklyn for four years. The seventh witness not subpoenaed was Mr. Ali of MAI Computers of Maryland. Gaines testified that he had nothing to do with computer sales by petitioner. Mr. Ali could have testified that he bought computers from Gaines and the petitioner delivered them. Petitioner testified that he had no knowledge of memory cards and that he never had seen one before being shown one by the FBI. Petitioner's trial counsel, a retired IBM employee himself, knew many IBM employees who could have testified about no

knowledge of memory cards, including himself. Carl McDonald testified that petitioner knew about memory cards because he worked for design tracking systems. Petitioner's trial counsel could have obtained petitioner's [13]IBM work record and easily disproved this. If trial counsel had interviewed, investigated, or subpoenaed these witnesses and documents given to him by petitioner long before the trial, the government witnesses would have been further impeached by eye witness accounts and testimony, petitioner's statements would have been collaborated. Defendant was denied effective assistance counsel when defense counsel's interviews with key state witnesses or potential defense witnesses were inexplicably brief and often non-existent, attorney failed to conduct independent investigation which could easily have produced evidence which might have effected defendants acquittal. Failure to adequately investigate case ad prepare defense may constitute ineffective assistance. Taylor v. Hilton 563 F. Supp. 913(1992).

## 2.    TRIAL COUNSEL FAILED TO REQUEST ANY PRE-TRIAL MOTIONS.

Trail counsel failed to request a suppression hearing on statements made by petitioner to IRS agent Richard Fallon before trial. When agent Fallon approached the petitioner, the agent asked the petitioner, after identifying himself, it he had an attorney. The petitioner gave the agent his attorney's card with name, telephone number and address on it. The agent then asked the petitioner if he wanted to help in the investigation of stolen memory cards. The petitioner was eager to help so he said yes and told the agent just what took place. The petitioner didn't know that the agent had him under investigation and was there to serve him a subpoena on his corporate records. The petitioner told the agent that he paid Carl McDonald approximately $40,000 for services rendered, work Carl

---

[13] see Exhibit F

EXHIBIT 6

198

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------x

UNITED STATES OF AMERICA

        v.                    95 CR. 0057 (BDP)

JAMES R. GREEN

              Defendant.
-------------------------------x

                        U.S. Courthouse
                        White Plains, N.Y.
                        March 7, 1996
                        1:00 p.m.


Before:         HON. BARRINGTON D. PARKER, JR.
                      U.S. District Judge


APPEARANCES

MARY JO WHITE
    United States Attorney for the
    Southern District of New York
    Assistant United States Attorney
BY:  BARBARA GUSS, A.U.S.A.


DOMENICK PORCO, ESQ.
    Attorney for Defendant James Green


Sue Ghorayeb, R.P.R., C.S.R.
Official Court Reporter

8

205

1    each of the issues individually, because each of them,

2    your Honor, obviously, impacts on the guidelines

3    calculation.

4           THE COURT:  Well, let me perhaps start off this

5    way.  Let me give what the Court concludes are its

6    tentative guideline calculations --

7           MR. PORCO:  Yes.

8           THE COURT:  -- and then you can respond to

9    them.  I will give you the context.

10          The presentence report reflects a base offense

11   level of four that I agree with.  I believe that's

12   accurate.  The presentence report for the first group of

13   counts, Counts One, Two and 24, indicates an addition of

14   18 points due to a loss of more than $20 million and

15   less than $40 million.  I believe that, based on the

16   testimony that I heard at trial, that figure was

17   somewhat high.  It, in essence, reflected the amount of

18   money IBM could sell these products as essentially new

19   products in an unselling market.  The testimony made it

20   clear that these products were deposited in an inventory

21   that IBM called its end-of-life inventory, and it's not

22   clear that a $29 million figure is appropriate.

23          I, for the purpose of this sentencing, am

24   adopting the price that the first good faith purchaser,

25   Peter Hunt, was willing to pay, which was $8,270,000.

1   So, accordingly, my calculation yields an addition of 16

2   as opposed to 18 points.

3       My calculations, like the presentence report,

4   include a two-point addition for more than minimal

5   planning.  My calculations, like the presentence report,

6   yield a two-point addition for obstruction of justice.

7       With respect to the next group of counts,

8   that's for Count 7, 8, 10, 11, 13, 14, 16, 18, 19, 21

9   and 22, I agree with the presentence report that the

10  base level is four.  For the purpose of this sentencing,

11  the amount of money laundered that I am attributing to

12  this defendant is $390,000 in view of the acquittal on

13  the other count, and that yields an addition of 3

14  points.

15      I am similarly imposing a two-point addition

16  for more than minimal planning, two-point addition for

17  obstruction of justice.

18      Thus, my calculations yield an offense level --

19  an initial offense level of 24, with respect to the first

20  group and 23 with respect to the second.  There are two

21  unit additions, which leaves me with a behavior offense

22  level of 26, criminal history category of one, and a

23  guideline range of 63 to 78 months.

24      MR. PORCO:  Your Honor has conducted the

25  analysis as I would have urged you to do.  You had

EXHIBIT 7

BG29:rp

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x

UNITED STATES OF AMERICA              :

      - v -                        :      **INDICTMENT**

WILLIAM E. GREEN, JAMES R. GREEN,     :      95 Cr. 57 (BDP)
HAROLD P. JACKMAN, and
JOSEPH STANCIL,                       :

           Defendants.     :

------------------------------------x

### COUNT ONE

The Grand Jury charges:

### Introduction

### IBM Business and Policies

1.    International Business Machines Corporation
("IBM") is a corporation which manufactures a variety of
computers and computer programs.

2.    IBM has an active research and development program
and frequently develops new computer models.

3.    As older computer models are replaced in IBM's
line-up by newer ones, IBM donates some of its discontinued
models to non-profit organizations.  Rather than sell the
remaining discontinued models -- which would undercut sales on
newer models -- IBM pays other companies to dismantle and recycle
components of discontinued IBM models and equipment.

4.    Until January 1992, IBM manufactured and marketed
IBM Model number 3090, which was a multi-million dollar mainframe
computer.  Model 3090 computers contained memory cards for the

BG29:rp

storage of data.  These memory cards could be used in other computers.

### The Co-Conspirators

5.   At all times relevant to this Indictment, Carl A. McDonald, a separately charged co-conspirator, was employed by IBM as a manager in the Department of Reutilization and was responsible for inventory of IBM Model 3090 mainframe computers that were no longer marketed by IBM and which contained memory cards for the storage of data.

6.   At all times relevant to this Indictment until July 31, 1992, the defendant WILLIAM E. GREEN, was employed by IBM as an analyzer in the Power Mechanical Division.  His duties included ordering computer hardware from within IBM, but did not encompass the requisitioning of IBM computer memory cards.

7.   At all times relevant to this Indictment, commencing from on or about July 29, 1992, the defendant JAMES R. GREEN, a former employee of IBM, and the brother of the defendant WILLIAM E. GREEN, was doing business under the name of "Technical Solutions," in Poughkeepsie, New York.

8.   At all times relevant to this Indictment, the defendant HAROLD P. JACKMAN, a former employee of IBM, was employed as a salesman at High-Point Computer Services, Inc. in Lithonia, Georgia.

2

BG29:rp

9.    At all times relevant to this Indictment, the defendant JOSEPH STANCIL was President of High-Point Computer Services, Inc.

10.    At all times relevant to this Indictment, Robert M. Gaines, a separately charged co-conspirator, was president of Data Systems Consultants, Inc., in Bethesda, Maryland.

## The Theft and Sale of IBM Memory Cards

11.    Between on or about July, 1992 and October 20, 1992, and at the direction of defendants HAROLD P. JACKMAN and JAMES R. GREEN, co-conspirator Carl A. McDonald, with the assistance at times of defendant WILLIAM E. GREEN, stole from IBM a large quantity Model 3090 memory cards with a retail value of more than $20,000,000.

12.    Defendants HAROLD P. JACKMAN and JAMES R. GREEN in turn sold those Model 3090 memory cards, which they then and there well knew to be stolen, at prices far below market value.

13.    To conceal these illegal transactions, the following steps, among others, were taken:

a.    Co-conspirator Robert M. Gaines created a phony invoice in an attempt to conceal the fact that wire transfers of approximately $390,000 to defendant JAMES R. GREEN were actually in payment for stolen Model 3090 memory cards.

b.    Defendants JOSEPH STANCIL and HAROLD P. JACKMAN used phony invoices in an attempt to conceal the fact that wire transfers of approximately $350,000 to High-Point

3

8G29:rp

Computer Services, Inc. were actually in payment for stolen Model 3090 memory cards.

## Statutory Conspiracy Charge

14. From in or about June 1992 continuing up to the date of the filing of this Indictment, in the Southern District of New York and elsewhere, the defendants, the separately charged co-conspirators, and others known and unknown to the Grand Jury, unlawfully, wilfully and knowingly did combine, conspire and confederate and agree together and with one another to commit offenses against the United States, to wit, violations of Title 18, United States Code, Section 2314 (interstate transportation of stolen property) and Section 1343 (wire fraud).

## Objects of the Conspiracy

15. It was a part and an object of the conspiracy that the defendants JAMES R. GREEN and WILLIAM E. GREEN, the separately charged co-conspirators, and others known and unknown to the Grand Jury unlawfully, wilfully, and knowingly would and did transport, transmit, and transfer in interstate commerce goods, wares and merchandise, of the value of $5000 and more, to wit, more than $20 million worth of IBM Model 3090 memory cards, knowing the same to have been stolen, converted and taken by fraud, in violation of Title 18, United States Code, Section 2314.

16. It was a further part and object of said conspiracy that the defendants, the separately charged co-

4

BG29:rp

conspirators, and others known and unknown to the Grand Jury
unlawfully, wilfully, and knowingly would and did devise and
intend to devise a scheme and artifice to defraud, and for
obtaining money and property by means of false and fraudulent
pretenses, representations, and promises, and would and did
transmit and cause to be transmitted by means of wire and radio
communication in interstate commerce, signals and sounds for the
purpose of executing such scheme and artifice, in violation of
Title 18, United States Code, Section 1343.

### Means and Methods of the Conspiracy

17.  It was a means and method of this conspiracy that
the defendants JAMES R. GREEN and WILLIAM E. GREEN and their co-
conspirators, knowing that the memory cards were stolen,
transported from New York to Connecticut and other states
approximately 3000 stolen IBM Model 3090 memory cards, worth more
than $20 million.

18.  It was a further means and method of this
conspiracy that the defendants JAMES R. GREEN and WILLIAM E.
GREEN and their co-conspirators made interstate telephone calls
to further their scheme to deprive IBM of more than $20 million
worth of IBM Model 3090 memory cards.

### Overt Acts

19.  In furtherance of the conspiracy and to effect the
illegal objects thereof, the following overt acts, among others,

5

BG29:rp

were committed in the Southern District of New York and
elsewhere:

    a.    In or about July 1992, in Kingston, New York,
co-conspirator Carl McDonald removed and stole approximately 1000
IBM 3090 memory cards from computers stored in IBM Building 969.

    b.    On or about July 8, 1992, in Atlanta,
Georgia, co-conspirator Carl McDonald made a telephone call to
defendant HAROLD P. JACKMAN in Lithonia, Georgia.

    c.    On or about July 16, 1992, in Poughkeepsie,
New York, defendant JAMES R. GREEN received a telephone call from
defendant HAROLD P. JACKMAN in Lithonia, Georgia.

    d.    On or about July 22, 1992, at approximately
10:57 a.m., co-conspirator Carl McDonald, in Poughkeepsie, New
York, made a telephone call to defendant HAROLD P. JACKMAN in
Lithonia, Georgia.

    e.    On or about July 22, 1992, at approximately
12:46 p.m., defendant HAROLD P. JACKMAN, in Lithonia, Georgia,
caused a telephone call to be made to an unindicted co-
conspirator in Connecticut ("the Connecticut Co-Conspirator"),
during which Jackman caused to be faxed a price list or IBM Model
3090 memory cards.

    f.    On or about July 25, 1992, in Huntington,
Connecticut, at approximately 10:54 a.m., the Connecticut Co-
Conspirator telephoned defendant HAROLD P. JACKMAN in Lithonia,
Georgia.

BG29:rp

g.    On or about July 25, 1992, at approximately 10:58 a.m., in Poughkeepsie, New York, co-conspirator Carl McDonald received a telephone call from defendant HAROLD P. JACKMAN in Lithonia, Georgia.

h.    On or about July 27, 1992, in Poughkeepsie, New York, defendant WILLIAM E. GREEN, who was still employed by IBM, requisitioned approximately 1008 IBM Model 3090 memory cards, knowing he had no legitimate purpose for doing so.

i.    On or about July 28, 1992, in Kingston, New York, defendant WILLIAM E. GREEN and co-conspirator Carl McDonald went to the loading dock of IBM Building 052, where they caused the approximately 1008 IBM Model 3090 memory cards, which defendant WILLIAM E. GREEN had requisitioned, to be loaded onto McDonald's personal pickup truck.

j.    On or about July 28, 1992, in the vicinity of Poughkeepsie, New York, defendant JAMES R. GREEN paid for a self-storage unit at Arnoff Moving and Storage, Inc.

k.    On or about July 28, 1992, co-conspirator Carl McDonald transferred the stolen IBM Model 3090 memory cards into the storage unit, which defendant JAMES R. GREEN had paid for, at Arnoff Moving and Storage, Inc.

l.    On or about July 29, 1992, in the vicinity of Poughkeepsie, New York, defendant JAMES R. GREEN caused to be filed a Business Certificate, in which he certified that he was conducting business as "Technical Solutions."

7

BG29:rp

m.    On or about August 11, 1992, in Meriden, Connecticut, the Connecticut Co-Conspirator caused to be deposited a $100,000 check from a computer parts buyer in partial payment for the purchase of stolen IBM 3090 memory cards.

n.    On or about August 12, 1992, at approximately 8:37 p.m., defendant JOSEPH STANCIL, in the vicinity of Atlanta, Georgia, received a telephone call from the residence of defendant JAMES R. GREEN in Poughkeepsie, New York.

o.    On or about August 12, 1992, at approximately 9:03 p.m., in Poughkeepsie, New York, a phone call was made from the residence of defendant JAMES R. GREEN to the Connecticut Co-Conspirator.

p.    On or about August 13, 1992, in a motel in Poughkeepsie, New York, defendant HAROLD P. JACKMAN made telephone calls to co-conspirator Carl McDonald and to defendant JAMES R. GREEN.

q.    On or about August 14, 1992, in Poughkeepsie, New York, the Connecticut Co-Conspirator rented a truck.

r.    On or about August 19, 1992, at approximately 10:33 a.m., in Poughkeepsie, New York, co-conspirator Carl McDonald made a telephone call to defendant HAROLD P. JACKMAN in Lithonia, Georgia.

s.    On or about August 19, 1992, in Wappingers Falls, New York, co-conspirator Carl McDonald shipped to the

8

BG29:rp

Connecticut Co-Conspirator, via United Parcel Service, a box containing approximately 13 stolen IBM 3090 memory cards.

t.    On or about August 20, 1992, in Hyde Park, New York, co-defendant Carl McDonald rented a Guardian Self-Storage unit in the name of Technical Solutions, giving the name of defendant JAMES GREEN as an authorized person to gain access to the unit.

u.    On or about October 2, 1992, in Poughkeepsie, New York, co-conspirator Carl McDonald caused approximately 360 IBM 3090 memory cards to be requisitioned.

v.    On or about October 2, 1992, in Poughkeepsie, New York, co-conspirator Carl McDonald telephoned HAROLD P. JACKMAN in Lithonia, Georgia.

w.    On or about October 4, 1992, an unindicted co-conspirator from Dutchess County, New York ("Dutchess County Co-Conspirator") transported stolen IBM 3090 memory cards from Poughkeepsie, New York, to Meriden, Connecticut.

x.    On or about October 19, 1992, in Poughkeepsie, New York, co-conspirator Carl McDonald telephoned defendant HAROLD P. JACKMAN in Lithonia, Georgia.

y.    On or about October 20, 1992, in Poughkeepsie, New York, co-conspirator Carl McDonald caused approximately 828 IBM Model 3090 memory cards to be requisitioned.

BG29:rp

z.   On or about October 21, 1992, in Lithonia, Georgia, defendant HAROLD P. JACKMAN telephoned the Connecticut Co-conspirator.

(Title 18, United States Code, Section 371.)

## COUNT TWO

The Grand Jury further charges:

20.   The allegations contained in Paragraphs 1 through 13 of this Indictment are hereby repeated, realleged, and incorporated by reference herein as though fully set forth herein.

21.   From in or about July 1992, through in or about February 1993, in the Southern District of New York and elsewhere, the defendants, JAMES R. GREEN, HAROLD P. JACKMAN, and WILLIAM E. GREEN,  and others known and unknown to the Grand Jury, unlawfully, wilfully and knowingly did transport, transmit and transfer in interstate commerce goods, wares and merchandise, of the value of $5000 and more, to wit, the defendants transported, and aided and abetted in transporting, from New York to Connecticut and elsewhere, more than $20 million worth of IBM Model 3090 computer memory cards, knowing the same to have been stolen, converted and taken by fraud.

(Title 18, United States Code, Sections 2314 and 2.)

## COUNTS THREE THROUGH SIX

The Grand Jury further charges:

10

BG29:rp

22.   The allegations contained in Paragraphs 1 through 13 of this Indictment are hereby repeated, realleged, and incorporated by reference herein as though fully set forth herein.

23.   On or about the dates listed below, in the Southern District of New York and elsewhere, the defendants JAMES R. GREEN, HAROLD P. JACKMAN, and WILLIAM E. GREEN, unlawfully, wilfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, to wit, the defendants engaged in a fraud to deprive IBM of its property, i.e. more than $20 million worth of IBM Model 3090 memory cards, transmitted and caused to be transmitted by means of wire communications in interstate commerce, signs, signals and sounds for the purpose of executing such scheme and artifice, to wit, the following telephone calls:

| COUNT | WIRE COMMUNICATION | APPROXIMATE DATES |
|-------|--------------------|-------------------|
| 3     | Telephone calls between Carl McDonald in Poughkeepsie, New York and HAROLD P. JACKMAN in the vicinity of Atlanta, Georgia | July 8, 1992 through October 30, 1992 |
| 4     | Telephone calls between JAMES R. GREEN in Poughkeepsie, New York and HAROLD P. JACKMAN in the vicinity of Atlanta, Georgia | July 15, 1992 through October 22, 1992 |
| 5     | Telephone calls between HAROLD P. JACKMAN in the vicinity of Atlanta, Georgia and the Dutchess County Co-Conspirator in the vicinity of | July 30, 1992 through October 12, 1992 |

11

BG29:rp

Poughkeepsie, New York

6       Telephone call from the                   August 12, 1992
        residence of JAMES R.GREEN
        in Poughkeepsie, New York, to
        JOSEPH STANCIL in the vicinity
        of Atlanta, Georgia

        (Title 18, United States Code, Sections 1343 and 2.)

### COUNT SEVEN

The Grand Jury further charges:

24.   The allegations contained in Paragraphs 1 through
13 of this Indictment are hereby repeated, realleged, and
incorporated by reference herein as though fully set forth
herein.

### Money-Laundering Conspiracy Charge

25.   From in or about June 1992 continuing up to the
date of the filing of this Indictment, in the Southern District
of New York and elsewhere, the defendants, JAMES R. GREEN, HAROLD
P. JACKMAN and JOSEPH STANCIL, the separately charged co-
conspirators, and others known and unknown to the Grand Jury,
unlawfully, wilfully and knowingly did combine, conspire and
confederate and agree together and with one another to commit
offenses against the United States, to wit, violations of Title
18, United States Code, Sections 1956(a)(1)(B)(i) and 1957
(relating to money laundering).  With respect to all acts in
furtherance of the conspiracy from June 1992 through October 28,
1992, this conspiracy violated Title 18, United States Code,
Section 371.  With respect to overt acts on and after October 28,

12

BG29:rp

1992, in furtherance of the conspiracy, this conspiracy violated Title 18, United States Code, Section 1956(h).

### Objects of the Money-Laundering Conspiracy

26.   It was a part and object of said conspiracy that the defendants JAMES R. GREEN, HAROLD P. JACKMAN and JOSEPH STANCIL, the separately charged co-conspirators, and others known and unknown to the Grand Jury, knowing that the property involved in certain financial transactions represented the proceeds of some form of unlawful activity, unlawfully, wilfully and knowingly would and did conduct and attempt to conduct such financial transactions, which in fact involved the proceeds of specified unlawful activity, to wit, the interstate transportation of stolen property and wire fraud, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, source, ownership and control of the proceeds of such specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

27.   It was a further part and object of said conspiracy that the defendants JAMES R. GREEN, HAROLD P. JACKMAN and JOSEPH STANCIL and others known and unknown to the Grand Jury unlawfully, wilfully and knowingly would and did engage and attempt to engage in monetary transactions in criminally derived property that was of a value greater than $10,000 and which was derived from specified unlawful activity, to wit, the interstate

BG29:rp

transportation of stolen property and wire fraud, in violation of Title 18, United States Code, Section 1957.

### Means and Methods of the Money-Laundering Conspiracy

28.   It was a means and method of this conspiracy that the defendants JAMES R. GREEN, HAROLD P. JACKMAN and JOSEPH STANCIL and their co-conspirators laundered more than $700,000 of the proceeds from the sales of the stolen 3090 IBM Model memory cards by, among other things, wiring the proceeds to Technical Solutions, High-Point Computer Services, Inc., Data Systems Consultants, Inc., and other entities in order to conceal the nature and source of the proceeds.

29.   It was a further means and method of this conspiracy that the defendants JAMES R. GREEN, HAROLD P. JACKMAN and JOSEPH STANCIL and their co-conspirators withdrew money in amounts greater than $10,000 from the bank accounts of Technical Solutions, High-Point Computer Consultants, Inc., Data Systems Consultants, Inc., and other entities, which funds were the proceeds of the sale of stolen IBM Model 3090 memory cards.

### Overt Acts

30.   In furtherance of the conspiracy and to effect the illegal objects thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.   On or about September 16, 1992, in Poughkeepsie, New York, defendant JAMES R. GREEN caused a

BG29:rp

business checking account to be opened in the name of Technical
Solutions at The Bank of New York.

        b.    On or about September 23, 1992, in
Poughkeepsie, New York, the above-described business checking
account of Technical Solutions received a wire transfer of
$190,000 from the Connecticut Co-Conspirator.

        c.    On or about September 23, 1992, in
Poughkeepsie, New York, defendant JAMES R. GREEN made a telephone
call to defendant HAROLD P. JACKMAN in Lithonia, Georgia.

        d.    On or about September 24, 1992, in Atlanta,
Georgia, a Nationsbank of Georgia, N.A. account of High-Point
Computer Services, Inc. received a wire transfer of $150,000 from
the Connecticut Co-Conspirator.

        e.    On or about September 24, 1992, in
Poughkeepsie, New York, defendant JAMES R. GREEN, wrote a check
in the amount of $8600 to co-conspirator Carl McDonald, drawn on
the account of Technical Solutions.

        f.    In or about October 1992, in the vicinity of
Bethesda, Maryland, co-conspirator Robert M. Gaines, at the
direction of defendant JAMES R. GREEN, caused to be created a
phony invoice, dated September 15, 1992, to the Connecticut Co-
Conspirator, directing that payment of $389,592 be made in two
stages to Technical Solutions, and falsely stating that the
payment was for four computers, whereas in truth and fact, as

15

8G29:rp

they then and there well knew, the payment actually was for stolen IBM Model 3090 memory cards.

g.    On or about October 1, 1992, in Poughkeepsie, New York, defendant JAMES R. GREEN caused $30,000 to be sent by wire transfer to the account of Leo Industries, Inc., a company in which defendant JAMES R. GREEN and co-conspirator Gaines wanted to invest.

h.    On or about October 22, 1992, in Poughkeepsie, New York, The Bank of New York checking account of Technical Solutions received a wire transfer of $200,000 from the Connecticut Co-Conspirator.

i.    On or about October 22, 1992, in Poughkeepsie, New York, defendant JAMES R. GREEN telephoned defendant HAROLD P. JACKMAN in Lithonia, Georgia.

j.    On or about October 23, 1992, in Poughkeepsie, New York, defendant JAMES R. GREEN wrote a check in the amount of $8000 to co-conspirator Carl McDonald, drawn on the account of Technical Solutions.

k.    On or about November 4, 1992, in Atlanta, Georgia, a Nationsbank of Georgia, N.A. account of High-Point Computer Services, Inc. received a wire transfer of $241,000 from the Connecticut Co-Conspirator.

l.    On or about November 4, 1992, in Poughkeepsie, New York, defendant JAMES R. GREEN caused $110,000

16

BG29:rp

to be sent by wire transfer to the account of Data Systems
Consultants, Inc. at the Citizens Bank of Maryland.

m.    On or about January 8, 1993, in the vicinity
of Atlanta, Georgia, defendant JOSEPH STANCIL wrote a check to
cash in the amount of $100,000, which check was drawn on the
account of High-Point Computer Services, Inc.

(Title 18, United States Code, Section 371 and
Title 18, United States Code, Section 1956(h).)

## COUNTS EIGHT THROUGH FIFTEEN

The Grand Jury further charges:

31.    The allegations contained in Paragraphs 1 though
13 of this Indictment are hereby repeated, realleged, and
incorporated by reference herein as though fully set forth
herein.

32.    On or about the dates listed below, in the
Southern District of New York and elsewhere, the defendants
listed below, knowing that the property involved in the financial
transactions set forth below represented the proceeds of some
form of unlawful activity, unlawfully, wilfully, and knowingly
did conduct and attempt to conduct and did aid, abet, and cause
others to conduct and attempt to conduct such financial
transactions, which financial transactions in fact involved the
proceeds of specified unlawful activity, to wit, the interstate
transportation of stolen property and wire fraud, knowing that
the transactions were designed in whole and in part to conceal

17

BG29:rp

and disguise the nature, source, ownership and control of the
proceeds of such specified unlawful activity:

| COUNT | DEFENDANTS | APPROXIMATE DATE | TRANSACTION AND APPROXIMATE AMOUNT | RECIPIENT |
|---|---|---|---|---|
| 8 | JAMES R. GREEN, HAROLD P. JACKMAN | 9/23/92 | $190,000 wire transfer | Technical Solutions |
| 9 | JAMES R. GREEN, HAROLD P. JACKMAN, JOSEPH STANCIL | 9/24/92 | $150,000 wire transfer | High-Point Computer Services, Inc. |
| 10 | JAMES R. GREEN | 10/01/92 | $30,000 wire transfer | Leo Industries, Inc. |
| 11 | JAMES R. GREEN, HAROLD P. JACKMAN | 10/22/92 | $200,000 wire transfer | Technical Solutions |
| 12 | JAMES R. GREEN, HAROLD P. JACKMAN, JOSEPH STANCIL | 11/04/92 | $200,000 wire transfer | High-Point Computer Services, Inc. |
| 13 | JAMES R. GREEN | 11/07/92 | $70,000 wire transfer | Data Systems Consultants, Inc. |
| 14 | JAMES R. GREEN | 11/18/92 | $110,000 wire transfer | Data Systems Consultants, Inc. |
| 15 | HAROLD P. JACKMAN JOSEPH STANCIL | 1/08/93 | $100,000 check | HAROLD P. JACKMAN |

(Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 2.)

### COUNTS SIXTEEN THROUGH TWENTY-THREE

The Grand Jury further charges:

33.   The allegations contained in Paragraphs 1 through
13 of this Indictment are hereby repeated, realleged, and

BG29:rp

incorporated by reference herein as though fully set forth
herein.

34.    On or about the dates listed below, in the
Southern District of New York and elsewhere, the defendants
listed below unlawfully, wilfully and knowingly did engage in and
attempt to engage in and did aid, abet, and cause others to
engage in and attempt to engage in monetary transactions set
forth below, in criminally derived property that was of a value
greater than $10,000 and was derived from specified unlawful
activity, to wit, the interstate transportation of stolen
property and wire fraud:

| COUNT | DEFENDANTS | APPROXIMATE DATE | TRANSACTION AND APPROXIMATE AMOUNT | RECIPIENT |
|-------|-----------|------------------|-----------------------------------|-----------|
| 16 | JAMES R. GREEN, HAROLD P. JACKMAN | 9/23/92 | $190,000 wire transfer | Technical Solutions |
| 17 | JAMES R. GREEN, HAROLD P. JACKMAN, JOSEPH STANCIL | 9/24/92 | $150,000 wire transfer | High-Point Computer Services, Inc. |
| 18 | JAMES R. GREEN | 10/01/92 | $30,000 wire transfer | Leo Industries, Inc |
| 19 | JAMES R. GREEN, HAROLD P. JACKMAN | 10/22/92 | $200,000 wire transfer | Technical Solutions |
| 20 | JAMES R. GREEN, HAROLD P. JACKMAN, JOSEPH STANCIL | 11/30/92 | $200,000 wire transfer | High-Point Computer Services, Inc. |
| 21 | JAMES R. GREEN | 11/07/92 | $70,000 | Data Systems |

19

BG29:rp

| | | | | wire transfer | Consultants, Inc. |
|---|---|---|---|---|---|
| 22 | JAMES R. GREEN | 11/18/92 | $110,000 wire transfer | Data Systems Consultants, Inc. | |
| 23 | HAROLD P. JACKMAN JOSEPH STANCIL | 1/8/93 | $100,000 check | HAROLD P. JACKMAN | |

(Title 18, United States Code, Sections 1957 and 2.)

## COUNT TWENTY-FOUR

The Grand Jury further charges:

35.   On or about August 12, 1993, in the Southern District of New York, the defendant, JAMES R. GREEN, in a matter within the jurisdiction of a department and agency of the United States, unlawfully, wilfully and knowingly did make false, fictitious and fraudulent statements and representations, to wit, the defendant falsely told a Special Agent of the Internal Revenue Service that the checks that defendant JAMES R. GREEN had given to Carl McDonald in 1992 were for consulting services in setting up a manufacturing facility, and that the wire transfer in 1992 of $190,000 to defendant JAMES R. GREEN was payment for the sale by Data Systems Consultants, Inc. of Risk Model 6000 computer equipment, whereas as the defendant then and there well knew, the aforementioned checks and wire transfer were actually part of the proceeds of the sale of the stolen IBM Model 3090 memory cards described in Count Two of this Indictment.

(Title 18, United States Code, Section 1001.)

20

BG29:rp

## COUNT TWENTY-FIVE

The Grand Jury further charges:

36.   From in or about March 1993, up to and including the date of this Indictment, a duly empaneled Grand Jury in the Southern District of New York was conducting an investigation of various entities and individuals, including the defendants herein, for, among other things, conspiracy and interstate transportation of stolen property, which crimes would violate Title 18, United States Code, Sections 371 and 2314, and other federal criminal statutes.

37.   On or about May 10, 1993, JOSEPH STANCIL, the defendant, was served with a Grand Jury subpoena requiring production of, among other things, corporate documents of High-Point Computer Services, Inc., relating to the Connecticut Co-Conspirator.

38.   In or about June, 1993, in the Southern District of New York, the defendant, JOSEPH STANCIL, unlawfully, wilfully and knowingly did corruptly influence, obstruct and impede the due administration of justice, and did corruptly endeavor to influence, obstruct and impede the due administration of justice, to wit, the defendant produced pursuant to Grand Jury subpoena, copies of High-Point Computer Services, Inc. invoices 3202, 3203, 3489, 3502, and 3512, in the total amount of $345,215, which invoices purported to be for a yearly maintenance charge on a service contract and certain other goods and services, but which

21

BG29:rp

in fact were what defendant STANCIL knew to be phony invoices,

which defendant STANCIL intended and used to conceal from the

Grand Jury the true nature of the transactions described in

Counts Nine and Twelve above.

      (Title 18, United States Code, Sections 1503 and 2.)


_____        _____
FOREPERSON                      MARY JO WHITE
                                   United States Attorney

EXHIBIT 8

*Exhibit  C3*

FD-302 (Rev. 3-10-82)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription      4/1/94

     CARL MC DONALD, under a cooperation agreement, provided the following information to the below listed Special Agents (SAs) at the Newburgh Office of the Federal Bureau of Investigation:

     MC DONALD advised that "TCMs" were Thermal Conductor Modules.  He further advised that the TCMs were the main guts of the 3090 Model Main Frame computer system and were more expensive than memory cards. He noted that the TCMs are usually serialized and tracked within International Business Machines (IBM). IBM should have a history of where they are. He further noted that the TCM can be traced to the "gate" which is on a 3090 Main Frame Computer.  The TCM board is on the door of a 3090 computer. He also noted that some of those main frame computers were held at the 952 Building before they were recycled. IBM was to pull TCMs and memory out of the computers before they were recycled. They were supposed to make them unoperationable by slamming them with a big hammer. He noted that the TCMs that were to be surplused and destroyed were those coming back from the field. He further advised that TCMs were built in Poughkeepsie, New York.

     MC DONALD advised that about one and one half years ago many of the machines were held at the WESTERN publishing building across from MARIST COLLEGE on Route 9 in Poughkeepsie. IBM employee BARBARA MORSE would come up with a list of machines to be destroyed. The Financial Department would give the okay for the destruction. MORSE knew which were the best machines in storage and she knew which machines would subsequently be destroyed. She maintained the list of machines.  She knew the better machines by model number.

     MC DONALD advised that the Design Practices Task Force at IBM, Poughkeepsie, did an audit on the memory cards in the latter part of 1991-1992. It was headed by an individual by the name of JOHN SECRETO.  The jist of his reports were that memory cards were missing and they could not differentiate between new cards and used cards in Kingston where they were stored. All of

---

Investigation on  3/31/94  at  New Windsor, NY  File # 87B-NY-236028

by  SAS JOSEPH T. HIGGINS/
RICHARD FALLON, IRS/CID/JTH/amt  Date dictated  4/1/94

3501 - A1

FD-302a (Rev. 11-15-83)

b,B-NY-236028

Continuation of FD-302 of   CARL MC DONALD                    On   3/31/94   , Page   2

　　　this was brought to the attention of ROBERT J. GAMBLE, the
Materials Manager (the Assistant Plant Manager), who now is
working with IBM, Raleigh, North Carolina. He further noted that
auditors came to IBM after his arrest to conduct an audit of the
memory cards. He further advised that he had a conversation with
General Manager FRANK JONES of the Poughkeepsie plant, who said
there was a serious problem within IBM and that MC DONALD's theft
was not the only theft and there was a bigger problem and JONES
had told him that he was a businessman and he needed to plug the
holes and he wanted MC DONALD to make recommendations so that
possibly maybe the charges against him could be dropped. He noted
that the IBM lawyers had control over the situation. He further
advised that they were not happy with the FBI involvement in this
matter, but he was not sure if it was an image problem or a
business problem.

　　　MC DONALD advised that he knew a 3090 Main Frame
Computer machine was worth, with all the works inside, hundreds
of thousands of dollars depending upon the model. He further
noted that when a machine was to be recycled, the serial number
was cut from the machine, and that served as proof that the
machine had been crushed and was used as a tax write-off by IBM.

　　　MC DONALD described 3090 Memory in three classes.
First, was new, which came off the line. Second, was equal to
new, which he called ETN, and three, which he called used.

　　　Concerning JIMMY GREEN, MC DONALD advised that he and
JIMMY discussed the part numbers of the memory cards that he had
access to, and then they discussed which part numbers would be
better for him to get ahold of. MC DONALD advised regarding his
operation in which he was attempting to donate 3090 Main Frame
Computers, he needed to fill them with memory, so he had to go
and order parts. He usually made a list of parts for what he
needed for these machines.  This became part of the scheme to get
memory cards.  At one point he told JIMMY GREEN about the list of
parts in the storage facility.  He gave the list to JIMMY GREEN.
He also advised that, he, MC DONALD, possibly faxed a similar
list to JACKMAN.  Concerning the self storage facilities, MC
DONALD advised that JIMMY GREEN had the key and code to one of
the storage rooms. The last four numbers were the same as the
telephone number to TECHNICAL SOLUTIONS in Poughkeepsie. He
advised that he, MC DONALD, gave JIMMY GREEN the key and the
code. He further advised that he thought that his son CARL, JR.

FD-302a (Rev. 11-15-83)

87B-NY-236028

Continuation of FD-302 of ___CARL MC DONALD_____ , On  3/31/94  . Page   3

had helped him unload some of the memory card boxes at the
storage facility. He went on to say that initially some of the
memory cards were stored at the ARNOFF STORAGE FACILITY on Route
55, and it was noted that it was too close to the road, with high
visibility, so JIMMY rented a self storage room at GUARDIAN.
JIMMY had rented it because JIMMY had restaurant equipment in
this facility.  He further advised that the initial loads of
memory cards that were stolen came from Building 052 and some
from 969, which were placed into ARNOFF STORAGE. He first started
stealing cards in July, 1992. About this time he had given JIMMY
GREEN the parts and quality list. He noted that he had talked to
JACKMAN on the telephone on about July 29th and told him the part
numbers available. JIMMY told MC DONALD not to talk on the
telephone about their business regarding IBM memory cards. He
further advised that JIMMY GREEN would tell him to contact
JACKMAN and send him a list or fax him a list because JACKMAN was
a broker. Within about a week the memory cards were usually gone
from the storage facility. MC DONALD did not know if GREEN was
moving it or shipping it or had sold it. He further advised the
only place he could of gotten the information regarding
CONNECTICUT COMPUTER was from JIMMY GREEN. Concerning HAROLD
JACKMAN, MC DONALD advised that JACKMAN would call him  if he was
in the Poughkeepsie area. MC DONALD recalled two trips he made to
Poughkeepsie.  Regarding MC DONALD's arrest, he advised that
JIMMY GREEN told him after his arrest, "if you have any parts
lists get rid of them". He said they could use them against me.

        MC DONALD advised that the bottom line motive of for
what he did was to make $100,000.00. If he got caught he would be
fired. He figured he was going to be laid off anyway, he did not
think the police would get involved. There were no serial numbers
on the memory cards, and that is the reason why he did not take
any TCMs because there was serial numbers on them.

EXHIBIT 9

were worth nothing on their books. A defendant has a due process right to be sentenced on the basis of accurate information. United States v. Tucker 404 U.S. 443,447,92 S.CT.589,591,30 L.ED. 2d 592 (1972).

## 2. SENTENCING COUNSEL FAILED TO FILE A MEMORANDUM OF LAW REQUESTING THE GUILTY VERDICT OF PETITIONER FOR MONEY LAUNDERING 1956 (A) (1) (B) (1) AND 1957 TO BE REVERSED BECAUSE OF LACK OF EVIDENCE TO MONEY LAUNDERING.

Following the teaching of the second circuit court of appeals and its sister circuits, that to be convicted under U.S.C. 1956 (a)(1)(b)(1), the government must prove concealment. The money laundering statute makes it very clear that to convict under this statute, the government must prove not just that the defendant spent ill-gotten gains, but that the expenditures were designed to hide the provenance of the funds involved. In Garcia-Emanuel 14f3d 1469(10th cir. 1994), while there are many things criminals can do with their profits that would arouse suspicion of intent to launder, many actions that are merely suspicious and do not provide substantiating evidence of design to "conceal", will not alone support money laundering conviction under 1956 (a)(1)(b)(1). Taken together these cases makes clear that the mere accumulations of non-concealing behavior is not enough for a conviction for money laundering. Rather there must be evidence that the transactions were designed in whole or part to conceal or disguise the nature, location, source, ownership, or the control of the proceeds of specified unlawful activity.

In Sanders 928 F.2d 940,946(19th cir. 1991), the court rejected the government argument that the money laundering statute be interpreted too broadly, encompassing all transactions, however ordinary, on their face which involve the proceeds of "unlawful" activity. To so interpret the statute would, in the court's view, turn the money laundering

statute into a money spending statute. This interpretation would be contrary to congress' expressly stated intent that the transactions being criminalized in the statute are those transactions designed to conceal or disguise the nature, location, source, ownership, or the proceeds of specified unlawful activity. Also in Sanders, evidence of design to conceal the nature of or source of proceeds used to purchase cards was insufficient where defendant and his wife were present at the purchase and readily identified by respective sales persons and cars conspicuously used by them. In the instant offense case at the bar, there was no attempt to disguise the nature, the location, the source, the ownership, or the control of the proceeds. Petitioner received two wire transfers totaling $390,000 from Connecticut Computers. The money was wired to Technical Solutions, petitioner's company. Since the petitioner didn't do any business with them the petitioner's asked his business associate, [16] who claimed it was a deal he had been working on and gave petitioner an invoice, just for petitioner's records. The invoice was not shown to anybody so there was no cover up by the petitioner.

    1.) Petitioner did not make any sale to Connecticut Computers of any property stolen or otherwise. All evidence presented at trial does not point to any sales by petitioner[17] (see grand jury testimony of Lisa McEachern and testimony by Lark Suddith who said that Harold Jackman hired him and that Jackman had made the deal with Connecticut Computers. Throughout the trial there was no evidence to directly show that petitioner knew that stolen parts were sole to Connecticut Computers. All evidence presented was at best circumstantial and implied.

---

[16] see Exhibit H
[17] see Exhibit I

2.) Wire transfers in its very nature do not conceal the origin of the transaction. Wire transfers require the following information: a) person or company sending the money, b) person or company receiving the transfer, c) account number of receiver, d) purpose of transaction, e) date of transaction, f) ABA number (American Banking Association), g) account number of sender, h) account number of receiver, i) name of bank and location of receiver, j) ABA number of sender. As demonstrated above, the very nature of a wire transfer is designed not to conceal. In the case at bar, petitioner, after receiving the money wire, transferred it to one person per transaction, in his own name, and company name, and his own address. The receiver of all transactions could clearly identify the petitioner. The following transactions were entered into by the petitioner. Thirty thousand ($30,000) to LEEO Industries from petitioner to purchase stock transferred to Robert Gaines, petitioner's business associate. The deal was made with the petitioner present. Dr. King could easily identify the petitioner. Petitioner paid Carl McDonald by check clearly identifiable, for services rendered, $40,000. The invested $30,000 in the American corporation for investment purpose, a check was given directly to the president, signed by the petitioner. Petitioner purchased computers from Alpha Computers, paid the president by check. Petitioner wire transferred $180,000 to Robert Gaines. Certainly he could identify the petitioner and one transfer took place. There is no evidence to show money outside pay for toner cartridges coming back to petitioner or any agreement to become part of any investments by Gaines. At no time did any proceeds handled by petitioner, make more than one exchange of hands.

Robert Gaines testified to money laundering. However, the evidence does not show it. Robert Gaines produced a document he says petitioner asked him to produce. At the time he produced the document, he knew it wouldn't conceal the money. Gaines testified that he was very familiar with wire transfers. He was account representative at IBM. So, if he was trying to conceal money, he knew that wouldn't be the way. In fact, wire transfers are preferred by the IRS because they leave clear and concise trails. In <u>United States v. Skinner 946, F.2d 176, 179 (1991)</u>, the second circuit noted that the sending of money to Blodgett only aided Skinner in continuing her cocaine business so that he would continue to front her the cocaine by sending it through the mail. <u>Id. at 179</u>. The second circuit found that they did not attempt to conceal a serious crime through their financial transactions, <u>U.S. v. Caba 911 F. Supp. 630 (ED.N.Y. 1996), U.S. v. Napoli 54 F. 3rd 63 (2nd cir. 1995)</u>. Defendants could not be convicted of money laundering given lack of evidence showing concealment of wire transfers of drug proceeds made by defendants, which precluded finding that transactions were designed to disguise the nature or source of proceeds as required by statutes. Defendants used own names when making transfers and no evidence showed that money was received by anyone other than those named in records transferred, 18 U.S.C.A. 1956 (a)(1)(b)(1).

<u>U.S. v. Herron 97 F. 3d 234 (8th cir. 1996)</u>. quote- In other words the mere fact that Herron and Jarret used wire transfers to send money to Chicago, cannot by itself satisfy the concealment element of the offence. Such interpretation of the statute would render this separate element repetitive and meaningless. Because there is no evidence in the record that the appellant made any efforts to disguise the drug proceeds, we reverse their

convictions for money laundering.   There is no evidence in this case that petitioner concealed any proceeds wired to him, therefore, conviction of money launder has to be reversed.

### 3.   SENTENCING COUNSEL FAILED TO OBJECT TO THE ADDITION OF TWO POINTS FOR MORE THAN MINIMUM PLANNING AND TWO POINTS FOR OBSTRUCTION.

Enhancement for minimum planning, obstruction of justice and question of amount of money attributed the victim actually lost was known to counsel long before sentencing came up.  On November 17, 1995, a letter was written by co-counsel [18]Richard Hendrix originally addressed to Percy Briscoe as counsel for petitioner's sentencing.  This letter directly described what counsel should be prepared for and what he should object to.  In this case, the counsel failed to prepare for sentencing.  There was no evidence in this case to support a two point enhancement in the trail.  In fact, just the opposite occurred.  The petitioner was said, by all witnesses for the government, to have just known about the robbery and sale of memory cards.  Carl McDonald testified that he planned the robbery long before he even told petitioner what he was working on at IBM.  He testified that he planned the robbery in early spring of 1992.  Then McDonald testified that he first told petitioner in July of 1992 what he was working on.  There is no testimony from Lark Suddith that petitioner hired him to drive the truck to Connecticut Computers or paid him.  In fact, he testified that Jackman paid him and hired him to pick up a truck at the petitioner's house only.  Robert Gaines testified that petitioner told him to make an invoice to conceal sales.  Robert Gaines did not say that petitioner made sale or directed anyone to do so.  Concealment does not further conspiracy.  Lisa McEachern, of

---

[18] see Exhibit M

APPENDICE   B

JUDGEMENT & COMMITMENT

AO 245B (Rev. 3/95) Sheet 1 - Judgment in a Criminal Case

230

DEFENDANT:        James R. Green

CASE NUMBER:      7:95CR00057-002

# ADDITIONAL COUNTS OF CONVICTION

| Title & Section | Nature of Offense | Date Offense Concluded | Count Number(s) |
|---|---|---|---|
| 18 U.S.C. ' 1956 | Money laundering | 11/18/1992 | Eight, ten, eleven, thirteen |
| 18 U.S.C. ' 1956 | Money laundering | 11/18/1992 | fourteen |
| 18 U.S.C. ' 1957 | Money laundering | 11/30/1992 | Sixteen, Eightteen, Nineteen |
| 18 U.S.C. ' 1957 | Money laundering | 11/30/1992 | Twenty One, Twenty Two |
| 18 U.S.C. ' 1001 | Making false statements. | 08/12/1993 | Twenty Four |

AO 245B (Rev. 3/95) Sheet 2 - Imprisonment

231

Judgment-Page __2__ of __

DEFENDANT:      James R. Green

CASE NUMBER:    7:95CR00057-002

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of      72    month(s)    .

☐ The court makes the following recommendations to the Bureau of Prisons:

☐ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

   ☐ at _____ a.m./p.m.  on _____ .

   ☐ as notified by the United States Marshal.

☒ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

   ☒ before 2 p.m. on      04/22/1996     .

   ☐ as notified by the United States Marshal.

   ☐ as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

_____

_____

_____

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____

UNITED STATES MARSHAL

By _____

Deputy U.S. Marshal

AO 245B (Rev. 3/95) Sheet 3 - Supervised Release

Judgment-Page __3__ of __

DEFENDANT:    James R. Green
CASE NUMBER:    7:95CR00057-002

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of    __3__    year(s)

The defendant shall report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state, or local crime.

The defendant shall not illegally possess a controlled substance.

*For offenses committed on or after September 13, 1994:*

The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as directed by the probation officer.

☐ The above drug testing condition is suspended based on the court's determination that the defendant poses a low risk of future substance abuse. (Check, if applicable.)

☒ The defendant shall not possess a firearm as defined in 18 U.S.C. § 921. (Check, if applicable.)

If this judgment imposes a fine or a restitution obligation, it shall be a condition of supervised release that the defendant pay any such fine or restitution that remains unpaid at the commencement of the term of supervised release in accordance with the Schedule of Payments set forth in the Criminal Monetary Penalties sheet of this judgment.

The defendant shall comply with the standard conditions that have been adopted by this court (set forth below) . The defendant shall also comply with the additional conditions on the attached page (if indicated below).

See Special Conditions of Supervision - Sheet    3.01

## STANDARD CONDITIONS OF SUPERVISION

1) the defendant shall not leave the judicial district without the permission of the court or probation officer;
2) the defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month;
3) the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;
4) the defendant shall support his or her dependents and meet other family responsibilities;
5) the defendant shall work regularly at a lawful occupation unless excused by the probation officer for schooling, training, or other acceptable reasons;
6) the defendant shall notify the probation officer ten days prior to any change in residence or employment;
7) the defendant shall refrain from excessive use of alcohol;
8) the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;
9) the defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer;
10) the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;
11) the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;
12) the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court;
3) as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics, and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

AO 245B (Rev. 3/95) Sheet 3 - Supervised Release

DEFENDANT:       James R. Green
CASE NUMBER:     7:95CR00057-002

# SPECIAL CONDITIONS OF SUPERVISION

1) The defendant will not incur any new lines of credit without the prior approval of the probation department.

2) The defendant will provide any and all requested financial information to the probation department.

3) The defendant will pay restitution in the amount of $450,000.00 at a rate of 15% of his gross monthly income.

AO 245B (Rev. 3/95) Sheet 5, Part A - Criminal Monetary Penalties

234

DEFENDANT:    James R. Green
CASE NUMBER:    7:95CR00057-002

## CRIMINAL MONETARY PENALTIES

The defendant shall pay the following total criminal monetary penalties in accordance with the schedule of payments set forth on Sheet 5, Part B.

|  | Assessment | Fine | Restitution |
|---|---|---|---|
| Totals: | $ 850.00 | $ | $ 450,000.00 |

☐ If applicable, restitution amount ordered pursuant to plea agreement . . . . . . . . . . . . .    $ _____

## FINE

The above fine includes costs of incarceration and/or supervision in the amount of $ _____ .

The defendant shall pay interest on any fine of more than $2,500, unless the fine is paid in full before the fifteenth day after the date of judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 5, Part B may be subject to penalties for default and delinquency pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

　　☐ The interest requirement is waived.

　　☐ The interest requirement is modified as follows:

## RESTITUTION

☐ The determination of restitution is deferred in a case brought under Chapters 109A, 110, 110A and 113A of Title 18 for offenses committed on or after 09/13/1994, until _____ . An Amended Judgment in a Criminal Case will be entered after such determination.

☒ The defendant shall make restitution to the following payees in the amounts listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportional payment unless specified otherwise in the priority order or percentage payment column below.

| Name of Payee | **Total Amount of Loss | Amount of Restitution Ordered | Priority Order or Percentage of Payment |
|---|---|---|---|
| I.B.M. Corporation | | $450,000.00 | |
| Totals: | $ _____ | $ 450,000.00 | |

** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses

AO 245B (Rev. 3/95) Sheet 6 - Statement of Reasons

236

Judgment-Page  6  of  6

DEFENDANT:      James R. Green
CASE NUMBER:    7:95CR00057-002

# STATEMENT OF REASONS

☒ The court adopts the factual findings and guideline application in the presentence report.

## OR

☐ The court adopts the factual findings and guideline application in the presentence report except (see attachment, if necessary):

**Guideline Range Determined by the Court:**

    Total Offense Level:    \_\_\_\_26\_\_\_\_

    Criminal History Category:    \_\_\_\_I\_\_\_\_

    Imprisonment Range:    \_\_\_63\_\_\_ to \_\_\_\_78\_\_\_\_ months

    Supervised Release Range:    \_\_\_2\_\_\_ to \_\_\_\_3\_\_\_\_ years

    Fine Range:  $ \_\_\_12,500.00\_\_\_ to $ \_\_5,000,000.00\_\_

    ☒ Fine waived or below the guideline range because of inability to pay.

    Total Amount of Restitution: $ \_\_\_450,000.00\_\_\_

    ☐ Restitution is not ordered because the complication and prolongation of the sentencing process resulting from the fashioning of a restitution order outweighs the need to provide restitution to any victims, pursuant to 18 U.S.C. § 3663(d).

    ☐ For offenses that require the total amount of loss to be stated, pursuant to Chapters 109A, 110, 110A, and 113A of Title 18, restitution is not ordered because the economic circumstances of the defendant do not allow for the payment of any amount of a restitution order, and do not allow for the payment of any or some portion of a restitution order in the foreseeable future under any reasonable schedule of payments.

    ☐ Partial restitution is ordered for the following reason(s):

☒ The sentence is within the guideline range, that range does not exceed 24 months, and the court finds no reason to depart from the sentence called for by the application of the guidelines.

## OR

☐ The sentence is within the guideline range, that range exceeds 24 months, and the sentence is imposed for the following reason(s):

## OR

☐ The sentence departs from the guideline range:

    ☐ upon motion of the government, as a result of defendant's substantial assistance.

    ☐ for the following specific reason(s):

## CERTIFICATE OF SERVICE

I  _James R Green_  on this date  _September 8, 2000_ , herby

declare under penalty of perjury under the laws of the United States Of America

that the foregoing is true and correct, a copy of defendant's 28 U.S.C. § 2241

motion was mailed at Allenwood F.P.C. to United States District for the middle

District of Pennsylvania, P.O. box 1148 Scanton, PA. 18501

Declaration in form of 28 U.S.C. § 1746

RESPECTFULLY SUBMITTED

_James R Green_

JAMES R GREEN